Eldon G. Colvin et al., appellees, v. John Powell &
Company, Inc., a corporation, appellant, Impleaded
with James V. Hawk et al., appellees.

77 N. W. 2d 900

Filed July 13, 1956.   No. 33889.

*Fitzgerald, Ross & O'Conner,* for appellant.

*Gross, Welch, Vinardi & Kauffman,* for appellees Colvin et al.

*Cassem, Tierney, Adams, Kennedy & Henatsch,* for appellees Hawk et al.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, Eldon G. Colvin and Leonard Sweeney, brought this action against defendants, James V. Hawk and L. R. Hawk, doing business as Hawk Sales, Doctors Ross C. and James Bailey, and John Powell & Company, Inc., seeking to recover damages for the death of 33 head of feeder cattle and one sow, and for permanent injuries to the rest of their surviving herd of cattle which resulted from eating blackstrap molasses feed containing a deadly poison known as parathion. Such damages were alleged to have been proximately caused by negligence of defendant, John Powell & Company, Inc., in one cause of action, and by the negligence and breach of implied warranty by all other defendants in another. At conclusion of the evidence, plaintiffs' action was dismissed as against defendant L. R. Hawk. No complaint is made in that respect, and he is not involved in this appeal.

The separate answers of defendants James V. Hawk and Doctors Ross C. and James Bailey denied generally, then admitted the alleged negligence of defendant John Powell & Company, Inc., and alleged that such negligence of that defendant was the sole proximate cause of plaintiffs' damages for which it was liable. The answer of John Powell & Company, Inc., was a general denial.

The cause was tried and submitted to a jury as if plaintiffs' reply were a general denial. Thereupon, the jury returned a verdict in favor of plaintiffs but against only defendant John Powell & Company, Inc. The verdict awarded plaintiffs, as damages for the death of their livestock and incidental expenses in connection therewith, the sum of $5,508.90, with interest thereon from and after February 12, 1953, and awarded $11,472.22 as dam-

ages for injuries to the remainder of plaintiffs' herd. Judgment was rendered thereon accordingly against defendant, John Powell & Company, Inc., for $5,508.90, with interest at 6 percent from February 12, 1953, and for $11,472.22, with interest at 6 percent from April 7, 1955, the date of the verdict and judgment. At this point it should be said that the allowance of interest as aforesaid upon the $5,508.90 item has not been assigned as error by defendant, but it was a plain error unassigned. Such part of the judgment comes squarely within the rule that: "Recovery of interest on an unliquidated claim, the subject of reasonable controversy, and incapable of being fixed by computation, may be had only from the date of the determination of the right of recovery and the ascertainment of the amount." National Fire Ins. Co. v. Evertson, 157 Neb. 540, 60 N. W. 2d 638. However, it is conclusive that the jury did not include any interest in the sum of $5,508.90, so the trial court is directed to modify that part of its judgment allowing interest thereon at 6 percent from February 12, 1953, and require that such item, as hereinafter modified, shall bear interest at 6 percent from April 7, 1955, the date of the verdict and judgment.

Subsequently, plaintiffs' motion for new trial as to defendants James V. Hawk and Doctors Ross C. and James Bailey was sustained, and a new trial was granted as to them, from which ruling they have not pursued their appeal to this court. On the other hand, a hearing was had upon the motions of defendant John Powell & Company, Inc., hereinafter called defendant, for judgment notwithstanding the verdict, and for new trial. In that connection, the trial court overruled defendant's motions after approving plaintiffs' offer to remit $67.44, a sum subject to exact determination from the evidence and exhibits appearing in the record, which represented the difference in the cost of marketing. That item will be later discussed herein.

Thereafter, defendant appealed to this court, assign-

ing and arguing substantially: (1) That as a matter of law, negligence of defendant, if any, was not the proximate cause of plaintiffs' damages; (2) that the trial court erred prejudicially in giving instructions Nos. 1 and 7; and (3) that the verdict and judgment were not sustained by the evidence but were contrary thereto and contrary to law, and were the result of passion and prejudice. We conclude that assignments (1) and (2) should not be sustained, but that assignment (3) should be sustained in part only with relation to the allowance of $208 for 13 barrels of molasses included as incidental expenses in the award of $5,508.90. However, that sum of $208 is subject to exact determination, and we order and direct remittitur thereof from the sum of $5,508.90, as a condition of affirmance of the judgment. Such item will also be hereinafter discussed.

At the outset, it should be noted that defendant called no witnesses and offered no direct evidence in its own behalf either upon the issue of liability or the issue of damages about which it here complains. It relied solely upon the direct and cross-examination of plaintiffs' witnesses, including defendant's manager, and testimony adduced by witnesses called in behalf of other defendants, who admitted that defendant was negligent as alleged, and claimed that its negligence was the sole proximate cause of plaintiffs' damages. In that connection, plaintiffs claimed that defendant was negligent in selling as new or unused, barrels which had been previously used for poisonous substances, without properly inspecting the same, although defendant well knew or should have known that the barrels were to be used for livestock feed by placing blackstrap molasses therein, and failed to warn plaintiffs of the presence of poisonous substances in the barrels although defendant knew or should have known that the barrels contained poisonous substances.

This court recently reaffirmed that: "A motion for directed verdict or for judgment notwithstanding the verdict must be treated as an admission of the truth

of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence.

"In negligence cases the trial court should sustain a motion for directed verdict or for judgment notwithstanding the verdict, only when the evidence, viewed in the light most favorable to the party against whom the motion is directed, fails to establish actionable negligence." Griess v. Borchers, 161 Neb. 217, 72 N. W. 2d 820.

Also, in Driekosen v. Black, Sivalls & Bryson, 158 Neb. 531, 64 N. W. 2d 88, we reaffirmed that: "In a jury case involving issues of negligence, where different minds may reasonably draw different conclusions or inferences from the evidence adduced, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury, but where the evidence is undisputed, or but one reasonable inference or conclusion can be drawn from the evidence, the question is of law for the court.

"A party is only answerable for the natural, probable, reasonable, and proximate consequences of his acts; and where some new efficient cause intervenes, not set in motion by him, and not connected with but independent of his acts and not flowing therefrom, and not reasonably in the nature of things to be contemplated or foreseen by him, and produced the injury, it is the dominant cause.

"If the original negligence is of a character which, according to the usual experience of mankind, is liable to invite or induce the intervention of some subsequent cause, the intervening cause will not excuse it, and the subsequent mischief will be held to be the result of the original negligence.

"A vendor and the manfuacturer or supplier of a chattel who know or have reason to know that it is likely to be dangerous when used and which is pur-

chased as safe for use in good faith reliance upon their professions or representations of safety, competence, and care, are subject to liability to the purchaser or to others whom they should expect to share in or be in the vicinity of its use, for damages proximately caused by their failure to exercise reasonable competence and care to supply the chattel in a condition safe for use."

Further, in that opinion we said: "In Restatement, Torts, § 388, p. 1039, it is said: 'One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so.' Also, in Restatement, Torts, § 399, p. 1085, it is said: 'A vendor of a chattel, manufactured by a third person, who sells it knowing that it is, or is likely to be dangerous, is subject to liability as stated in §§ 388 to 390.' As stated in Restatement, Torts, § 401, p. 1087: 'A vendor of a chattel made by a third person which is bought as safe for use in reliance upon the vendor's profession of competence and care is subject to liability for bodily harm caused by the vendor's failure to exercise reasonable competence and care to supply the chattel in a condition safe for use.'

"In that connection, in Restatement, 1948 Supp., § 401, p. 710, it is said: 'A vendor of a chattel manufactured by a third person who has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is

supplied, or to others whom the vendor should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them.' See, also, Restatement, Torts, § 402, p. 1089, wherein it is said: 'A vendor of a chattel manufactured by a third person is subject to liability as stated in § 399, if, although he is ignorant of the dangerous character or condition of the chattel, he could have discovered it by exercising reasonable care to utilize the peculiar opportunity and competence which as a dealer in such chattels he has or should have.'

"As stated in 46 Am. Jur., Sales, § 817, p. 943: 'Moreover, where the seller of an article reasonably must know that if it is defective it will be imminently dangerous to persons likely to come in contact therewith, a duty rests upon him to use ordinary care to ascertain the condition of the article and see that it is safe, especially where, by representation or warranties that the article is safe, he induces the sale. If he fails to exercise ordinary care to ascertain the safety of the article, so that he actually sells it in an imminently dangerous condition, he is liable for injuries to third persons who he knows will come in contact with the article.' See, also, 46 Am. Jur., Sales, § 803, p. 928."

In Kroeger v. Safranek, 161 Neb. 182, 72 N. W. 2d 831, we held that: "A cause of an injury may be the proximate cause notwithstanding it acted through successive instruments or a series of events, if the instruments or events were combined in one continuous chain or train through which the force of the cause operated to produce the disaster."

In Hickman v. Parks Construction Co., 162 Neb. 461, 76 N. W. 2d 403, we said, citing numerous authorities: "The general rule, which governs where a party is responsible for a dangerous place, agency, instrumentality, or operation likely to cause injury or damage to persons or property rightfully in its proximity, is that he is charged with the duty of taking due and suitable pre-

cautions to avoid injury or damage to such persons or property, and his failure to take such precautions constitutes negligence. * * * The person on whom the duty devolves is not excused from taking the necessary precautions by * * * relying on others to take necessary precautionary measures."

In 49 C. J., Poisons, § 4, p. 1045, citing numerous authorities, it is said: "All persons who deal with deadly poisons or noxious and dangerous substances are held to strict accountability, and the highest degree of care must be used to prevent injury from their use." Also, in § 8, p. 1046, it is said: "Where one who knows that a substance is poisonous carelessly or negligently leaves it where he knows, or has reason to know, or by ordinary care should know, that it may cause injury to some one ignorant of its character, he is liable for any injury resulting from such exposure."

Further, as stated in 72 C. J. S., Poisons, § 5, p. 168, citing numerous authorities: "Where one who knows that a substance is poisonous carelessly or negligently leaves it where he knows, or has reason to know, or by ordinary care should know, that it may cause injury to some one ignorant of its character, he is liable for any injury resulting from such exposure, and the same liability attaches to one who leaves exposed a substance not known to be poisonous where his lack of knowledge is due to his own negligence."

In Carter v. Yardley & Co., Ltd., 319 Mass. 92, 64 N. E. 2d 693, 164 A. L. R. 559, a leading case, citing many authorities, it is said: "In principle, a manufacturer or other person owning or controlling a thing that is dangerous in its nature or is in a dangerous condition, either to his knowledge or as a result of his want of reasonable care in manufacture or inspection, who deals with or disposes of that thing in a way that he foresees or in the exercise of reasonable care ought to foresee will probably carry that thing into contact with some person, known or unknown, who will probably be ignorant of

the danger, owes a legal duty to every such person to use reasonable care to prevent injury to him. * * * In the application of the principle it is immaterial whether or not the conduct of a defendant amounted to a breach of the contract between him and the immediate buyer from him. The duty is not created by contract, but is an instance of the general human duty not to injure another through disregard of his safety."

In the light of such authorities and others hereinafter discussed, we have examined the record. The oral evidence is voluminous and there are numerous related exhibits. Summarized, the jury could have reasonably concluded as follows: Plaintiffs were equal partners in the raising of livestock and feeding of cattle upon a large scale. They were both experts with many years of successful experience in that field. In August 1952 plaintiffs went to Glendive, Montana, to inspect and buy reputation feeder calves. Plaintiff Colvin had made such purchases there each successive year since 1946 except 1951, during which year he fed heavier cattle because it was a financially hazardous calf-feeding year. In August 1952, while at Glendive, plaintiffs contracted to buy 302 head of mixed heifers and steers for delivery October 15, 1952, so that the calves could longer remain upon the range and obtain all possible cheaper gain in weight before delivery. All but two of the 302 head were branded reputation white-faced, fetter-necked Herefords. Upon delivery they were in excellent condition. They averaged 400 pounds each in weight, and cost plaintiffs a top price of $30.75 per hundredweight delivered. Plaintiffs sold 100 of those lighter in weight, which left 202 head, uniform in color, size, and weight, for better marketing. Thereto plaintiffs added 24 head of native-raised cattle of like kind and quality, which made a herd of 226 feeders so nearly alike that they could hardly tell one from another. From October 15, 1952, until Thanksgiving Day, the herd was permitted to range in the pasture and fields to better obtain a cheap-

er gain. However, upon that day there was a severe snowstorm, so the herd was put in the lot and started on feed earlier than usual. During December and January the herd was doing the best of any cattle plaintiffs had ever fed, and they continued to make such progress until February 10, 1953, the day the poisoning incident occurred.

Hawk was engaged in the selling of livestock feed, including barreled blackstrap molasses which is fed to cattle by gravity as a conditioner. He purchased such molasses from Doctors Bailey who were veterinarians at Atlantic, Iowa. There they had a 20,000-gallon, half-submerged supply tank into which they placed molasses from tank cars and from which they pumped molasses into barrels and sold them to Hawk who would make delivery thereof to his customers, collect from them, and pay the Baileys.

In the latter part of 1952 the Baileys could not obtain enough barrels in which to place the molasses so they requested Hawk to locate some. Hawk then contacted a broker in Omaha who advised him to contact defendant. Defendant then had some 500 such barrels stored outside its plant in Omaha, which barrels had been obtained from another chemical company in Wisconsin, but defendant could not use them because they were side-bung type.

In that connection, defendant was a large chemical company, engaged in the manufacture of insecticides which involved the use and processing of parathion, a deadly poison so powerful that it severely injures or kills man or animal either by inhalation, absorption, or oral ingestion. However, plaintiffs had no knowledge or notice of such use by defendant or the dangerous nature of the substance until after the loss of their cattle by such poisoning, and Hawk had no notice or knowledge thereof when he purchased the barrels from defendant, and had no notice or knowledge thereof until after another customer had suffered a loss hereinafter discussed.

In such a situation, Hawk contacted defendant's manager in January 1953 about the purchase of barrels and proceeded to defendant's plant for that purpose. There defendant's manager was told that the barrels were to be filled with molasses and sold for livestock feed, whereupon defendant's manager assured Hawk that they were all new barrels, although weather-worn, and had never been used or filled. Hawk made a spot check of a few of the barrels, all of which were blue-black with yellow ends, and finding no reason to believe that they were not unused and unfilled barrels as represented, and relying upon such representations made by defendant's manager, he bought 100 of the barrels for which he was reimbursed by the Baileys. Such barrels were subsequently picked up at defendant's plant by a trucker on Sunday and delivered to the Baileys. A short time later, by telephone order, another 50 barrels were purchased from defendant by the Baileys and delivered to them. At that time defendant's manager was also told that the barrels were to be used for molasses feeding. When delivered, the Baileys proceeded to make a spot check of some of the barrels, and finding no reason to believe that they were not unused, unfilled barrels as represented by defendant's manager, they proceeded to fill them with molasses.

On January 16, 1953, plaintiffs purchased 16 barrels of molasses from Hawk and began feeding it to their herd. On February 10, 1953, plaintiffs were feeding their fourth barrel, which was almost empty, when their cattle were poisoned. As they subsequently discovered, they were poisoned as the result of eating parathion solution in the barrel, which did not mix with but remained on the top of the molasses, and was consumed after the barrel was almost empty.

In the meantime, on February 1, 1953, one Haines, another customer of Hawk, notified him that one of his calves had died suddenly, and a veterinarian suspected that its death was caused by the molasses. Hawk im-

mediately contacted Doctor Ross .C. Bailey and they met at the customer's farm. There they inspected the dead animal and the barrel of molasses. They observed an amber-colored, acrid-smelling, watery fluid floating on top of the molasses. The doctor siphoned off a quantity of the fluid as a sample and placed it in a quart fruit jar. Further inspection also disclosed one other barrel so contaminated. Suspicious, but without knowledge of its nature, they took the sample with them. They also took the second barrel back to the doctor's office. Hawk contacted defendant's manager that evening, who assured him that there was nothing in the barrels. The next day Hawk took the Haines sample into his basement and divided it into four pint fruit jars so that there would be one sample for himself, one for Doctor Bailey, one for defendant, and one for the Omaha Testing Laboratory. As Hawk was dividing the sample, his dog sniffed it and immediately passed out with its eyes contracted to pin points. The following day Hawk took a sample to defendant's manager and reported the dog incident to him, whereupon he suggested that Hawk should have the Omaha Testing Laboratory run a test for parathion. Defendant's manager also informed Hawk that he had checked with his warehouse foreman and discovered that he had used two of the barrels in question to drain off lines and vats in defendant's plant after which they had then carelessly thrown those barrels back on the pile of unused barrels. Hawk was then assured by defendant's manager that those two barrels were the only ones they had ever used parathion in, and that Hawk's worries were over since they had been found and the rest of the barrels had never been used or filled.

Thereupon Hawk took a sample to the Omaha Testing Laboratory, and in a letter dated February 4, 1953, but obtained by Hawk February 8, 1953, it reported that the solution contained 63.5 percent parathion. In that connection, defendant's manager never had a test made of

his sample and subsequently, without explanation, he destroyed it.

In the meantime, although assured by defendant's manager that there were no other contaminated barrels, Hawk checked all the rest of them as a matter of precaution. However, for some reason, he failed to discover that any of them were contaminated. In making such inspection he visited plaintiffs' farm on February 5, 1953, and checked their barrels, but did not inform them that he was looking for contamination in their molasses. Rather, he advised that he was merely checking to see how fluid the molasses was in cold weather. Having no knowledge of the Haines incident or that the barrels of molasses were under suspicion, plaintiffs continued to feed the molasses until February 10, 1953, when their loss occurred.

Without question the barrel which caused the Haines' loss as well as the one taken from his farm and the one which caused plaintiffs' loss were parathion-contaminated barrels purchased from defendant. On February 12 defendant's manager, Hawk, and Doctor Ross C. Bailey had a conference, whereat defendant's manager was accused of selling barrels which had a poisonous substance in them, whereupon he replied that it began to look like that was the case.

Plaintiffs had a sample of the substance found in their barrel analyzed by the Harris Laboratory in Lincoln, which reported that the sample contained relatively large quantities of a chemical of the parathion class, which, after diluted 50 percent and administered orally in small quantities to two guinea pigs, caused them to become "restless within 15 minutes," to start "having convulsions about 30 minutes after the administration," and they "were dead within 10 minutes following onset of the convulsion." Although defendant's manager came out to plaintiffs' farm and they offered him a sample from plaintiffs' contaminated barrel, he showed no in-

terest. He did inspect Doctor Bailey's molasses plant and found no possible contamination there.

Two Iowa lawyers, who respectively represented Hawk and Doctors Bailey, called upon defendant's manager at defendant's plant on or about February 27, 1953, whereat he informed them that parathion handled at defendant's plant, was a dangerous substance, and that two or three more barrels containing parathion had subsequently been found in their stock of barrels. Admittedly, defendant's manager subsequently received orders from defendant's New York office to dispose of all the remaining 400 barrels "in such a way that they will be protected from any further contact with anybody." In conformity therewith, all of the barrels were taken out and buried in an east Omaha dump.

In the light of such evidence and rules heretofore set forth, we conclude that there was ample competent evidence from which the jury could have reasonably concluded that defendant was negligent as alleged, and that such negligence was a proximate cause of plaintiffs' loss.

Also, contrary to defendant's contention, instruction No. 3 specifically told the jury that no recovery could be had by plaintiffs against defendant for breach of implied warranty, but that in order to recover against such defendant the plaintiffs were required to prove by a preponderance of the evidence that defendant was negligent in one or more particulars as alleged by plaintiffs; that such negligence was *the* proximate cause of the death and injury to plaintiffs' cattle; and that as a result thereof plaintiffs were damaged, and the amount thereof. As a matter of fact, the instruction was favorable to defendant, because in order to recover plaintiffs were only required to establish by a preponderance of the evidence that such negligence of the defendant was *a* proximate cause of their damages.

We turn then to the question of the amount and measure of plaintiffs' damages. In doing so, we dispose of

the second and third assignments of error together, since they overlap in argument.

Originally, plaintiffs had 226 feeder calves in their herd. Before the poisoning incident on February 10, 1953, one of them had been slaughtered, two had been killed by lightning, two had been turned out of the feed lot because with calf, and one had died of bloat. Thus, immediately before February 10, 1953, there remained 220 head in plaintiffs' feed lot. They had been on full feed for some time and appeared to be doing better than any cattle plaintiffs had ever fed. Conservatively, they then weighed an average of 550 pounds each, and as feeder calves they could have readily been sold as such and had a reasonable market value of 28 to 30 cents a pound. On February 10, 1953, and immediately following, 33 of them and one sow died from poisoning by parathion. For such loss plaintiffs asked for and recovered 28 cents a pound on the basis of 550 pounds each. Such recovery was sustained by ample competent evidence.

In addition, 15 or 20 of the 187 surviving cattle were down and could not even get up. Forty or fifty of them were panting, frothing at the mouth, and stumbling about. At least half of those remaining showed that something had really hit them. Their sides were caved in; they were damp; and they looked as if they would die. The week following the poisoning, some of the cattle actually lost half their weight and generally the herd would not come up to eat. Several days after the poisoning 60 percent of them were in very bad condition. After the first 60 days some 60 to 70 percent of them did not put on enough weight to pay for half their feed bill. After 90 days it appeared that plaintiffs were wasting feed on two-thirds of the cattle. They were not fattening but remained in stocker stage. They had rough hair and a stale look; the whole herd was affected by the poisoning, although some of them were worse than others. It is undisputed that following the poison-

ing incident, the surviving cattle had no market value because there would be no buyer on the market if the truth were told, and the news of their poisoning had spread throughout the surrounding territory into the Omaha markets, and there was no place to market them.

Plaintiffs did not know what to do with them, so they consulted a market expert who had inspected the herd, knew the facts, and although prognosis was debatable, plaintiffs decided that the only thing they could do was to continue feeding the cattle, baby them along with the best of care, and attempt to get them ready for the late summer or fall market. Such cattle normally should be fed only about 4 months when on full feed, and with comparable care they should normally gain $2\frac{1}{4}$ to $2\frac{1}{2}$ or 3 pounds a day. In such respect, plaintiffs' surviving cattle were fed much longer before they were marketed, and, although extra protein was made available, they gained an average of only 1.68 pounds a day. One of the parties who bought 50 head of the original 100 lighter Glendive calves sold by plaintiffs shipped some of them at the same time and to the same market as plaintiffs shipped some of their surviving cattle. He received 75 cents per hundredweight more for them than plaintiffs received for theirs, despite the fact that his cattle had been on full feed only a little over 4 months, while plaintiffs' cattle had been on full feed about 11 months and normally should have outsold them.

This case was tried on the theory that the whole surviving herd was damaged, because under the circumstances no man could ascertain the nature and extent of injuries and damage to any specified number of the cattle, and damage to the herd could not be ascertained until marketing time. Plaintiff sought to recover as damages to the 187 cattle the difference, if any, between the reasonable market value of the cattle at the time of marketing if there had been no injury, and the reasonable market value of the claimed injured cattle at the time they were marketed. Competent evidence dis-

closes that the 187 surviving cattle, when expertly marketed to the best advantage with regard to weight and price, weighed 189,915 pounds and grossed $46,156.90, when without the poison injury they should have weighed 217,965 pounds and produced a gross total of $57,812.55, whereby plaintiffs suffered a loss of $11,655.65. Such proven loss was well above the jury's award of $11,472.22, less the remittitur of $67.44 offered and approved by the trial court, which part of the judgment, subject to the remittitur, should be affirmed unless other alleged errors require reversal thereof. We conclude that they do not.

In that connection, instruction No. 7 given by the trial court read: "If you find for the plaintiffs against one or more of the defendants, you will award the plaintiffs as against such defendant or defendants as you may find to be liable to the plaintiffs such sum as damages as you find plaintiffs have proved by a preponderance of the evidence will fairly and reasonably, but not excessively, compensate them for their damages.

"You are instructed that the measure of damages for 33 dead cattle and one dead sow is the fair and reasonable market value of those cattle and the sow at the time of their death and, in addition, the incidental expenses, if any, necessarily incurred by the plaintiffs in connection with said incident. In this connection, plaintiffs claim incidental expenses including payment to Harris Laboratories in the amount of $61.90; payment to Dr. South in the amount of $80.00; payment to Dr. Perley in the amount of $17.00; and the loss of 13 barrels of molasses in the amount of $208.00.

"You are further instructed that as to the 187 cattle, all or part of which are claimed by plaintiffs to have been injured but not rendered worthless, the measure of damages is the difference, if any, between the reasonable market value of the cattle at the time of marketing if there had been no injury and the reasonable market value of the claimed injured cattle at the time they were marketed. In arriving at the amount of damages in

this connection, you may take into consideration the quality of the cattle before the poisoning incident, their condition of health and thrift, and their condition after the incident, the care and feeding which they were given, the length of time they were fed, the circumstances as to whether as a result of poisoning they failed to feed in a normal and thrifty manner and to make normal gains in weight, and whether they failed to fatten and finish so as to commend a higher price than they brought on the market at the time of their sale. You may consider also any other fact or circumstance in the evidence bearing on the question whether the cattle made normal gain and whether they obtained proper finish.

"You are further instructed that in arriving at damages in this case, the burden is upon the plaintiffs to establish their damages with reasonable certainty, and you should not take into consideration any damages which are speculative and not established and proven with a reasonable degree of certainty, nor are you entitled to award plaintiffs any punitive or exemplary damages so as to punish defendants for any of the acts complained of."

The propriety of the rule with regard to the measure of damages for the 33 dead cattle and one dead sow as stated in the first sentence of the second paragraph of instruction No. 7 is not questioned. However, defendant argued that the jury award therefor was contrary to the evidence. In that respect, defendant claimed that about half of the dead cattle were heifers, worth less than steers, but the jury, assuming that each animal weighed 550 pounds, awarded plaintiff therefor 28 cents a pound, the then top market price for steers. Defendant's contention has no merit. The evidence discloses that at the time these reputation cattle died, they were feeder calves whose value could not be measured by a run-of-the-mill slaughter market. The evidence is undisputed that plaintiffs paid $30.75 per hundredweight for them when delivered, weighing an average 400 pounds

each, and that at the time of their death they weighed conservatively an average of 550 pounds each and were reasonably worth an average of 28 to 30 cents a pound. As a matter of fact, there is competent evidence in this record that the 33 dead cattle weighed as much as 600 to 650 pounds at the time of their death, yet plaintiffs asked only 28 cents a pound based upon an average weight of 550 pounds each. The jury allowed that amount, and competent evidence sustains that award.

Defendant also complained that among expenses incident to such loss, the jury awarded plaintiffs $208 for 13 barrels of molasses for which plaintiffs had paid Hawk, who retained the money. In that respect, the record discloses such to be the fact. It further discloses that at the time of trial plaintiffs still kept and retained such barrels of molasses, 12 of which do not appear to have been contaminated. Thus, the award of $208 was erroneously made, but concededly such sum was subject to exact determination and the error may be cured by remittitur.

In Moore v. Schank, 148 Neb. 228, 27 N. W. 2d 165, we held: "Where the excessive amount in a judgment is subject to exact determination, a remittitur may be required as a condition of affirmance for the correct amount."

In conformity therewith, a remittitur of $208 from the award of $5,508.90 for the dead cattle and sow and incidental expenses is hereby ordered and required as a condition for affirmance of a judgment for the correct amount, which is $5,300.90 with interest at 6 percent from April 7, 1955, the date of the verdict and judgment, and not from February 12, 1953.

In connection with the $208 item aforesaid, defendant also argued that its allowance demonstrated that the verdict and judgment were the result of passion and prejudice. We conclude that such contention has no merit under the circumstances presented in this case.

Defendant also argued that instruction No. 1 given by

the trial court, which summarized plaintiffs' petition, erroneously submitted the allegation that "187 cattle became ill and permanently injured and that their growth was stunted" rather than limiting the damages to a certain specified number of injured but surviving animals, and limiting recovery therefor in instruction No. 7 to the difference between their reasonable market value just before the poisoning and their reasonable market value immediately thereafter. In making such argument, defendant assumes, contrary to the evidence, that only 50 out of 187 surviving cattle were injured, and that immediately after the injury they had a reasonable market value. The evidence is directly contrary to such assumption.

In that connection, the case was tried on the theory of damage to the herd being prepared for market in the late summer or fall. The evidence is conclusive that 33 died, that 15 or 20 were down unable even to get up, and 40 to 50 were panting, frothing at the mouth, and staggering, with ultimate survival in doubt. All of the herd were injuriously affected to a considerable degree in one form or another, and after the poisoning they were disturbed, ill, would not eat, lost much weight, and thereafter gained an average of only 1.68 pounds a day, when normally without injury they should have gained $2\frac{1}{4}$ to $2\frac{1}{2}$ or 3 pounds a day. The evidence discloses that it was utterly impossible for plaintiffs and their experts after the poisoning to take each animal separately, or any exact number of them, and show how much damage was done. As a matter of fact, defendant, although having plenty of opportunity to do so, offered no evidence whatever upon such issue of damages, and this record shows conclusively that after the poisoning the surviving animals had no reasonable market value. Further, by simple mathematical calculation, if the measure of damages contended for by defendant had been submitted to the jury, plaintiffs would have been entitled to recover a much larger verdict and judgment.

It will be observed also that instruction No. 7 read in part: "You are further instructed that as to the 187 cattle, *all or part of which* are claimed by plaintiffs to have been injured * * * the measure of damages is the difference, if any, between the reasonable market value of the cattle at the time of marketing if there had been no injury and the reasonable market value of the claimed injured cattle at the time they were marketed." (Italics supplied.) The proper elements to be considered by the jury in arriving at the amount of such damages with reasonable certainty were thereafter set forth and circumscribed in detail. Contrary to defendant's contention, under the evidence appearing in this record, the damages recoverable were direct and certain and not remote or speculative.

In 25 C. J. S., Damages, § 71, p. 560, citing authorities, it is said: "Definite rules which will measure the extent of recovery in all cases even of a particular class are difficult to formulate owing to the consideration which must be given in each case to its specific and perhaps peculiar surrounding circumstances. Stated in broad terms, however, the measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty upon the person injured to exercise reasonable care to mitigate the injury, according to the opportunities that may fairly be or appear to be within his reach * * *. While the fundamental rule of the law is to award compensation, yet rules for ascertaining the amount of compensation to be awarded are formed with reference to the just rights of both parties, and the standard fixed for estimating damages ought to be determined, not only by what might be right for plaintiff to receive in order to afford just compensation, but also by what is just to compel defendant to pay." In § 72, p. 562, it is said: "Where there is more than one method of ascertaining damages, that method which is most defi-

nite and certain should be adopted. No one method is exclusive, where several exist, but that one should be chosen which best achieves the fundamental purpose of compensation to the injured person for his loss; and if the facts show that either of two measures of damages will fully compensate plaintiff for his loss, that measure must be adopted which is less expensive to defendant."

In Jaeger v. Hackert, 241 Iowa 379, 41 N. W. 2d 42, it is said: "Where it has been proved that damage has resulted and the only uncertainty is as to the exact amount, it is sufficient if the record shows 'data from which the extent of the injury * * * can be ascertained with reasonable certainty * * *. Data for an exact calculation is not necessary.' Osterling v. Frick, 284 Pa. 397, 404, 131 A. 250, 252; 25 C. J. S., Damages, section 28."

We find no case from this jurisdiction dealing with damages to feeder cattle where a portion of the herd has been injured but survived without having any reasonable market value, and no case has been cited or found from any other jurisdiction presenting comparable facts and circumstances. It would seem logical, however, that cases dealing with damages to growing crops which are injured by defendant, although not rendered worthless by them, but having no market value upon which any witness could or would give an opinion as to value until marketed, would present a situation comparable with that at bar. Here we are dealing with raising and feeding a herd of cattle for the late summer and fall market. In several cases this court has dealt with the question of damages to crops being grown for such markets. They support the logic of the measure of damages in instruction No. 7 given in the case at bar.

In Hopper v. Elkhorn Valley Drainage Dist., 108 Neb. 550, 188 N. W. 239, this court concluded that where a growing crop is injured but not rendered entirely worthless as a direct result of the acts and omissions of defendant, the damage to it is measured by the difference, if any, between the reasonable market value at maturity of

the probable crop if there had been no injury, and the reasonable market value of the actual crop at time of maturity, less the expenses of fitting for market that portion of the probable crop which was prevented from maturing by the injury. The instant case was tried on a comparable theory. No other measure of damages could have been submitted under the evidence adduced which would have fairly compensated plaintiffs, yet imposed a less burden upon defendant.

As recently as Gable v. Pathfinder Irr. Dist., 159 Neb. 778, 68 N. W. 2d 500, citing with approval Hopper v. Elkhorn Valley Drainage Dist., *supra*, we reaffirmed the foregoing rule, and then held: "In determining the damage to farm products consideration should be given to the circumstances which conditioned the probability or improbability of the maturing of the crops in the absence of injury, and all other facts and circumstances tending to establish such value, which would properly include those arising before, at the time of, and after injury."

Further, such case also held: "The office of the ad damnum in a pleading is to fix the amount beyond which a party may not recover on the trial of the action.

"As a general rule an amendment may be made to a pleading at any stage of the proceedings which does not change the quantum of proof as to a material fact." Such rules adversely dispose of defendant's contention that the trial court erred in permitting plaintiffs to amend their petition during the trial.

We conclude that under the unusual circumstances presented in this case, the issue of the measure of damages was not erroneously submitted to the jury with one exception, which does not require reversal. In such respect, relying upon Ricenbaw v. Kraus, 157 Neb. 723, 61 N. W. 2d 350, defendant argued that instruction No. 7 was erroneous because it failed to instruct the jury to deduct the difference in the cost of marketing. That contention has some merit, but the amount thereof,

$67.44, was the subject of exact determination by mathematical calculation from evidence and exhibits appearing in the record even independently of an affidavit filed by plaintiffs, and offered and received in evidence without objection by defendant, who made no counter showing at the hearing upon defendant's motion for new trial whereat plaintiffs' offer to remit the sum of $67.44 was approved by the trial court as a condition of overruling defendant's motion for new trial. Thus the failure of the court to instruct the jury to deduct the difference in the loss of marketing was not prejudicial error. Ricenbaw v. Kraus, *supra,* is distinguished upon the ground that no evidence therein established in any manner the reasonable expenses of fitting for market that portion of the probable crop which was prevented from maturing by the injury, and the trial court erroneously took judicial notice of what he thought would have been the fair and reasonable cost thereof, and deducted it. In that respect, we said: "We do not think it is a fact of which a court can take judicial notice as it may vary greatly under different circumstances. It is a fact which must be proved.

"In the absence thereof any judgment for damages would be speculative, conjectural, and uncertain."

Except as herein specifically modified, we conclude that the verdict and judgment were amply sustained by competent evidence, and that under the unusual circumstances presented in this case, the measure of plaintiffs' damages was not erroneously submitted.

Defendant argued that during the trial the court made some six improper remarks which influenced the jury and resulted in prejudice against the defendant. We have held that: "Each party to a lawsuit is entitled to have the jury pass upon the evidence without having its effect or importance altered, either as to credibility or value, by the indulgence of the court in remarks to witnesses or comments upon them or their testimony, which may tend either to magnify or diminish it in the jury's

estimation." Styskal v. Brickey, 158 Neb. 208, 62 N. W. 2d 854.

We have also held that: "A prerequisite to review on appeal of alleged improper conduct of and statements by a trial judge, on the trial in the presence of the jury, is an objection and exception thereto." Bolio v. Scholting, 152 Neb. 588, 41 N. W. 2d 913.

The latter rule is controlling here because defendant's counsel made no objection during the trial to the statements made by the court about which it complains. Furthermore, three of the six statements were directed to counsel for defendants Hawk and Bailey, for whom the jury awarded a favorable verdict, and could not have been prejudicial to them or to defendant. Some of the statements should not have been made, but defendant is in no position to complain thereof in this court.

For reasons heretofore stated, we conclude that if plaintiffs will file a remittitur within 20 days reducing the judgment to $16,705.68 with interest thereon at 6 percent per annum from April 7, 1955, the judgment of the district court will be affirmed as thus modified, with all costs taxed to defendant, John Powell & Company, Inc. Otherwise, the judgment will be reversed and the cause remanded for new trial.

AFFIRMED ON CONDITION.