JOHN RAYMOND FLYNN, APPELLEE, v. UNION STOCK YARDS COMPANY OF OMAHA (LIMITED), A CORPORATION, APPELLEE, IMPLEADED WITH B. ROTHSCHILD AND COMPANY, A CORPORATION, APPELLANT.

120 N. W. 2d 900

Filed April 5, 1963. No. 35326.

Morris J. Bruckner and Cassem, Tierney, Adams & Henatsch, for appellant.

George B. Boland and Boyle & Hetzner, for appellee Flynn.

Kennedy, Holland, DeLacy & Svoboda, for appellee Union Stock Yards Co.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This action was brought in the district court for Douglas County, Nebraska, by the plaintiff John Raymond Flynn against the defendants Union Stock Yards Company of Omaha (Limited), a corporation, and B. Rothschild and Company, a corporation. These defendants will at times be designated hereafter respectively as Stock Yards and Rothschild. When the term defendant alone is used, it will designate Rothschild. Plaintiff will be designated as he was in the district court, or as Flynn. Its purpose was to recover damages for personal injuries sustained by plaintiff, a self-employed order buyer at the Stock Yards, when attacked by a cow as he was attempting to cross one of the main north-south cattle alleyways of the Stock Yards at Omaha.

At the trial to a jury in district court the defendants at the conclusion of the plaintiff's evidence separately

moved for a directed verdict or a dismissal of the action as to each of them. The trial court sustained the motion of the defendant Stock Yards and dismissed the case as to it and overruled the motion as to the defendant Rothschild. No appeal was taken from the order of dismissal as to the defendant Stock Yards and it is no longer a party to the action.

Evidence was then introduced by defendant Rothschild, and the parties having rested it renewed its motion to direct a verdict in its favor or dismiss the action. This motion was overruled and the cause was submitted to the jury which resulted in a verdict and judgment for the plaintiff.

The defendant Rothschild thereafter filed a motion for a judgment notwithstanding the verdict. This was overruled and from the order overruling this motion defendant has brought the cause to this court by appeal.

No motion for a new trial was filed, hence the only question before us is whether the trial court erred in not sustaining Rothschild's motion for judgment notwithstanding the verdict. Therefore, the matter before us is whether the evidence was sufficient to permit the trial court to have submitted the cause to the jury.

The defendant Rothschild assigns as error that there was no competent evidence that the animal which injured plaintiff belonged to it or to show defendant was guilty of any negligence. There were other assignments of error which, in view of our decision, need not be discussed.

In considering the questions before us this court has stated the rule in Colvin v. Powell & Co., Inc., 163 Neb. 112, 77 N. W. 2d 900, as follows: "A motion for directed verdict or for judgment notwithstanding the verdict must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference

that can reasonably be deduced from the evidence."

It now becomes necessary to discuss the evidence with this rule before us.

The Stock Yards at Omaha, Nebraska, is the largest stockyards in the world, having a large area devoted to handling livestock. It is in close proximity to the packing houses and cattle are shipped there for sale and re-sale. The yards are divided into pens and blocks of pens which are maintained by dealers in livestock generally. There are alleyways connecting the various pens with each other and with the various scale houses where livestock are weighed, and chutes whereby shipments are loaded and unloaded. Among the various scales is scale No. 15 which is a short distance south of L Street which runs along the northerly portion of the stockyards. Along this street are chutes from which cattle are unloaded. To the immediate east and west of the scale house are cattle pens where cattle are kept before and after passing over the scales. After being weighed the cattle in many instances are kept in these pens temporarily until called for by the buyers or their representatives. An alley, 10.9 feet wide, extends in a southerly direction along the west side of the holding pens to the east of scale No. 15 and is crossed at right angles by a larger alley dividing the holding pens on its north from larger pens on the south where cattle are held for sale. The alley leading from the holding pens extends further south in a straight line from this intersection through the larger sale pens but is thereafter 13.8 feet to 13.7 feet in width, the additional width being on the east. It is called throughout this litigation the main north-south alley and will be so designated herein, though from an aerial photograph other alleys in the stockyards are longer and wider and apparently as important. To the east of this main north-south alley are the livestock pens operated by Buchanan and Son, livestock dealers. Three alleys extend westerly through these pens from the east to the main north-south alley

which are referred to as the Buchanan alleys. Gates are maintained near the intersection of the Buchanan alleys with this main alley. Each gate area is recessed along the east side of the main alley, the gates being installed 2.7 feet east of the east side of the alley. The north side of the southernmost of the Buchanan alleys, known as the south Buchanan alley, is approximately 141 feet south of the alley extending along the south side of the holding pens. The south Buchanan alley is 13.5 feet wide and its gate is recessed in the same manner. Across the main north-south alley to the west from the Buchanan pens are the livestock pens of Stock Growers & Tagg, livestock dealers. It will be referred to as Stock Growers as the witnesses generally termed it. It also has gated alleys opening in the main north-south alley but the gates are not recessed on the west side thereof. All of the alleys and pens are enclosed and separated by board or plank fences with gates at the opening of pens on the alleys, at the intersection of the alleys, and at various places along the alleys, which gates can be conveniently opened or closed that cattle may be driven from place to place throughout the yards by means of alleys closed off between certain points at convenient times. The closing off of the gates in the alleys so the cattle are restricted in the direction of their movement that they may not scatter in different directions is termed "lining the gates."

On August 25, 1959, plaintiff had entered the pens of Buchanan from the east by way of the south Buchanan alley, where he made a purchase of cattle. Thereafter he left the pens and re-entered the south Buchanan alley, walked west therein, and approached the main alley enroute to the Stock Growers pens across the main alley. He met in the south Buchanan alley Paul McCoy, a lifetime Stock Yards acquaintance. The gate from the south Buchanan alley to the main alley was closed and hooked. It was hinged to the north and was hooked on the south end on the main alley side. It swings open only to the

east. McCoy and plaintiff stopped and talked briefly some feet from it. Thereafter, plaintiff unhooked the gate and proceeded out into the main alley.

Until stepping out in the main alley plaintiff's vision was obscured because of the recessed gate, a wire fence, and a rack manger full of hay running to the top of the fence on the west end of the Buchanan pens.

Plaintiff testified he looked both ways when he stepped into the main alley. He could see approximately 100 to 150 feet to the north. He was sure he looked to the north again after taking a second step out into the alley but saw nothing either time he looked. He did not look again. The gates to the north were open. Plaintiff also looked south and saw neither animals nor persons, but couldn't remember whether the gates to the south were open or closed. After proceeding three or four steps west and possibly a little north he was struck by an animal that came from the north which he never saw or heard before the accident and cannot describe. He was thrown against the hinged side of a gate to the Stock Growers pens and the post to which it was anchored, and the calf of his leg was badly injured by an end of a bolt that protruded therefrom. He said the animal could have hidden in the recessed gate on the east side of the main alley 46 feet north of the point where the accident occurred.

Paul McCoy, the man with whom plaintiff was visiting was the only person to see the cow as it struck plaintiff. McCoy testified when plaintiff opened the gate McCoy reached through and hooked it behind him. Flynn continued across the alley going northwesterly. While hooking the gate McCoy took his eyes off the plaintiff for a split second. The next thing he knew he heard an animal snort. On looking toward plaintiff again he saw a cow was right on Flynn. Plaintiff was then headed north or a little northeast and the animal was moving southwesterly. The witness was not aware the animal was present until he heard it snort. He could

not see up the main alley north because of being in the recessed area. The cow struck plaintiff twice, once on the leg and again in the stomach. Flynn had gotten clear across the alley before being struck. After striking Flynn the second time the animal whirled, jumped over him, and came over to the corner toward McCoy who was still behind the gate. McCoy described the animal only as a white-faced Hereford range cow with a nub horn which was a subject animal. In what respect McCoy noticed the animal which attacked Flynn was a subject he does not state. The term "subject animal" will be explained later. After the cow came toward McCoy it turned and went back northward. He never saw it again and there is no evidence of its recapture or of what happened to it. After the cow went north McCoy entered the alley. There were no animals or other persons then in the alley that he saw. The gates to the north in the main alley were open but the gate in the main alley to the south of the Buchanan alley was closed. He helped the injured plaintiff to re-enter the Buchanan alley, seated him at a bench, and went to telephone for an ambulance. A crowd assembled in the alley where plaintiff was seated.

The plaintiff's injury appears to have occurred about 9:30 o'clock in the morning. There is some variance in the testimony as to the time this injury occurred and the time in which the cattle now to be mentioned were driven down the main alley beyond the entrance to the Buchanan south alley. There is evidence however from which the jury might believe the injury occurred but a few minutes afterward.

On the morning of August 25, 1959, at about 9 a.m., Edward Jimerson, a cattle driver for Rothschild, arrived at scale No. 15 to pick up some cattle purchased on the previous day. He contacted Richard Plambeck, employed by Stock Yards as a delivery or key man, because he held the key to the holding pens which must be unlocked to deliver the cattle. Jimerson signed a

book acknowledging receipt of the cattle at the scale house. Plambeck, testifying for plaintiff, said he then left the scale house, Jimerson went to line the gates in the main alley, and Plambeck went to the holding pens to release the cattle. The animals were identified by a tab given to the key man showing the pens, block, and number of cattle which were purchased. The same information is on the book Jimerson signed at the scale house. On the tab for the animals released was the word "wild," which had been written on it by someone the day before. This notation is customarily made in case a wild animal is included in those designated on the tab. Plambeck told Jimerson there was a wild cow in the "bunch" as they were leaving the scale house. He had however never seen the animal and got his information wholly from the tab. Plambeck went down the east alley to unlock the pens. The animal marked "wild" was in a pen by herself. He released the other animals first and then the subject cow, which was a cancerite and had sores, but he didn't remember anything concerning its horns. She immediately joined the other animals. He released them in alley No. 80 which runs east and west. He herded them down this alley until they got into the alley going south. After they got into the main north-south alley, Plambeck shut the gate behind them. Jimerson was then ahead of them a little way and the cattle were going south all in a group. Mr. Plambeck had counted the cattle and Jimerson had the correct number.

Jimerson, the cattle driver for Rothschild, testified for the defendant as to going to scale No. 15 much the same as did Plambeck. He said he received other cattle also, being from 7 to 12 in all. Jimerson said the subject cow he received was white-faced with a cancerous eye. He did not remember about its horns. Plambeck told him he had a wild cow. After signing the key book at the scale for the cattle he went south from scale No. 15 to line the gates. One of the gates closed was that

on the west end of the south Buchanan alley. After Jimerson lined the gates, the subject cow joined the others and all the cattle released by Plambeck followed him down the main north-south alley. It is shown that it is customary for one driver to so handle the cattle and to precede them. At a point between the pens of Buchanan and Stock Growers he met William Echtermeyer and told him he had been told he had a wild cow. His cattle were then strung out over 30 feet. Proceeding past the south Buchanan alley he closed and hooked a gate in the main alley behind the cattle. He proceeded thereafter again ahead of his cattle, lining the gates as he went, first south a short distance, then west about 70 feet to another north-south alley. There he turned south lining the gates and went approximately 300 feet south to what is called Reeves shanty. In this last north-south alley which is in the vicinity of Daugherties alley, he again hooked off another gate. Going back to the Daugherties alley he checked up and had all his cattle south of the gate. He then took them and other cattle he had left in the double alley west to scale No. 5.

William Echtermeyer, a self-employed cattle trader for 16 or 17 years, testified for the defendant. He testified that on August 25, 1959, he saw Jimerson while walking north in the main alley between Buchanan's, Stock Growers', and Tate's pens. It was in the morning between 9 and 10 or 10:30 o'clock. The cattle were behind Jimerson about 120 or 130 feet. Jimerson warned him that he had a wild cow in the group. Echtermeyer walking north in the main alley did not see Flynn or McCoy. He met Jimerson almost at the point where Flynn was hurt and passed the cows without incident. He went north into the next alley and turned off. He was there from 3 to 5 minutes and then came back. Later, when asked if it was 4 or 5 minutes, he said: "Well, whatever it was. It was a short time." On coming back there were then no cattle in the alley or going north to the gate in the north-south alley.

Flynn was injured when Echtermeyer came back and was lying down in the east Buchanan alley about one-third of the way down the Buchanan alley near the "Shanty." When he came back the gates toward the south down this main north-south alley were not closed.

This is the substance of all the evidence that relates to the cow that struck plaintiff or the handling of the cattle by Jimerson on August 25, 1959.

Joe Hrbek, a salesman for Stock Growers Live Stock Commission Company, testified for defendant that on August 24, 1959, he sold some cattle for that company to Mr. Haines, a representative of Rothschild. They were in Stock Grower's pens south of scale No. 15 immediately across the main alley from the Buchanan pens. There were several sold but he did not remember the exact number. Among them was a subject animal with a cancerous eye. He wasn't able to tell whether it had a stub horn. He said he didn't think the cancer was too bad and the eye not eaten out. After making the sale he cut these cattle out, pushed them out of the pen, and started them in the alley towards scale No. 15, but didn't go to the pen or see them weighed. The cow was not wild when he saw it.

Gordon Haines, a cattle buyer for Rothschild, testified for defendant to the same incident and said he bought 6 to 8 or 10 cows from Hrbek on August 24, 1959, including a subject animal with a cancerous eye. He gave no further description of it. It did not appear wild.

The deposition of John Maxwell, taken January 4, 1962, was read on behalf of the plaintiff. He was employed for 23 years by the Omaha Livestock Exchange as a cattle inspector and had been employed in and about the yards for 40 years. He was stationed at scale No. 15 on August 24, 1959. He inspects the cattle as they approached the pocket near the scales before they are weighed. If they are subject to various diseases, including lump jaw, cancers, wheezing, or if they just do not look right, he calls out to the men and they are not

weighed with the other cattle, but placed separately in a chute for tagging. When they are in the chute he puts a hog ring through their ear by means of pliers and on the ring is a tag one and one-half inches by one-half inch in dimension on which is a number. Such cattle must be slaughtered separately under further inspection. Animals tagged in this manner are termed "subject animals." At sometime on this particular day he tagged a cow from Stock Growers to Rothschild. The men in charge were warned she was a wild cow before she was placed in the pocket by a salesman whom he thinks was Joe Hrbek. Joe Hrbek took these cattle out of the alley. The cow was very wild and they lost 5 minutes getting her into the pocket and 10 to 15 minutes getting her into the tagging chute. He was pretty sure the horseman who put her in was John McLaughlin and that his horse just pushed her in. He thought she charged the horse once but was not sure. This cow was white-faced and had a cancerous eye. The whole eye was rotted out and there was simply a hole with what appeared to be meat inside. It had a nub horn. She was the only vicious one in that herd of the 6 to 12 cattle that were weighed together. He often has trouble with wild cattle. He does not put "wild" on the tabs. That is done by the counter-off man. The inspector would tag as high as 30 cattle as a subject in a 6 or 7-hour day of weighing. Especially is this true in the fall when they get western range cattle. There are more cancerite cattle at that time also, and many wild or unruly ones. The run of range cattle starts in late August. Sometimes there are 3 or 4 cancerite cattle in a row and sometimes not many more for a week. He cannot tell how many cattle he tagged that day. He could have had as many as 30 subject cattle that Monday and 5 or 10 white-faced cancerite ones.

John McLaughlin, an employee of Stock Yards, testified for the plaintiff. On August 24 and 25, 1959, he was a horseman at scale No. 15. A horseman flogs the cattle

from the scales after they are weighed and places them in the holding pens. He remembered an incident that occurred with a wild cow the day before Flynn was hurt. He guessed he placed this animal in pen No. 82 which pen is used for wild animals. He saw the cow and it had a cancerous eye but he gave no other description of it. He first said there were several wild cows that day but later that he did not know how many other wild cows there were that morning or how many cancer-eyed ones. He had no difficulty with the animal.

Michael Plasa testified for plaintiff. He was employed by Stock Yards. He was scale-counter at scale No. 15 on August 24 and 25, 1959, and had 6 or 7 men under him. As cattle come off the scales he counts them and assigns them to certain pens by lot number. The information is put on a tab left at the scale house and on a book called the counter-off book. If they are assigned to several pens that information is put down. He also writes "wild" on the records if an animal is wild. The animal is not described on the tab, the one word "wild" being put on the tab given out for the group. It is placed there as a warning. On August 24, 1959, he tabbed a wild cow sold to Rothschild. He had no remembrance of the cow so tabbed. There are several animals marked "wild" per day at that time of year. He was unable to say whether there were other wild animals in the vicinity. They probably weighed 2,000 cattle at that one scale on August 24th. He fixes the date from records which apparently he did not have with him and are not in evidence.

Henry Talmon who testified for plaintiff was weighmaster on August 24 and 25, 1959, at scale No. 15. He remembers weighing a wild animal on August 24, 1959. He recalled she was a subject animal, though why she was tagged he did not know. Later he says she was never tagged. He did not remember the color of the cow or anything else about it and said he wouldn't have known her if he saw her the next day.

Richard Kelly testified for plaintiff. He was employed by Stock Yards on August 24, 1959, as a catcher at scale No. 15. A catcher waits in the alley leading to the scales. He opens the gates and when the cattle are pushed into the pocket, closes the gates behind them. On the day before plaintiff's injury he remembers a wild cow with which he came into contact which was white-faced and had one stub horn. He doesn't remember how many wild cows he saw that day. He does not state who sold the cow or to whom it was sold and knew nothing of what became of it.

Paul Waldron was called by the plaintiff. The day before Flynn was hurt someone, who he believes was the horseman John McLaughlin, warned him that there was a wild cow "down there" in a pen. He went down to a pen and saw a cow which he supposed was the one of which he had been warned. It was white-faced and had a cancerous eye and a broken horn which you might call "stub." It gave off a smell. He does not remember the pen except it was east of scale No. 15. She was just standing there. Nothing is shown as to who owned the cow.

The plaintiff maintains that the admissions of the defendant introduced by plaintiff included an admission that the cow that injured the plaintiff was owned by the defendant. Examining them closely it appears that they are answers to questions concerning the cow owned by the defendant. They contain an answer to an interrogatory in which defendant denied it knew who owned the cow which injured the plaintiff.

Plaintiff claims his injuries were inflicted by the subject cow owned by the defendant tabbed as wild at the scale on August 24, 1959. This claim is based, first, on the identification of the cow which attacked the plaintiff which the witness McCoy described as a white-faced Hereford subject cow with a nub horn. It is next urged that the proximity of the time of injury to the time of the defendant's driving its cattle down the main alley,

coupled with this identification, is sufficient for the jury to infer that the cancer-eyed cow of the defendant escaped from the custody of its driver and was the cause of the injury, though there is a complete lack of other evidence that it did escape.

Concerning the description, every witness who identified a subject cow as one sold to the defendant or owned by it either on that day or the day on which the injuries occurred all agree that it was cancerite. The witness Plambeck who released it to the defendant merely states it was cancerite and had sores but does not specially relate the cancer to its eye and was not asked concerning its eye. Every other witness who in any way described this cow and relates it to the one sold to or owned by the defendant states it had a cancerous eye. The admissions of the defendant in interrogatories asked it introduced by the plaintiff stated that the cow purchased and received by it was a subject animal having a cancerous eye. This defect in the cow owned by the defendant is common to the description given by the witnesses. It seems to have been the most distinguishing mark of identification as it was noticed by all. Though this cow wheeled around and came directly towards the witness McCoy, he failed to observe this condition.

Though certain witnesses spoke of the animal with a nub or stub horn, there is no evidence as to the frequency of this characteristic in cattle.

There is positive evidence that the driver Jimerson closed two gates behind his cattle after passing the south Buchanan alley. The witness McCoy testified the gate was closed. The plaintiff urges the jury might infer Jimerson left it open. This the plaintiff assumes might be gathered from testimony of the witness Echtermeyer who said the gate was open when he returned 4 or 5 minutes "or whatever it was—it was a short time" later. When Echtermeyer returned, however, Flynn had been hurt, after which a crowd assembled.

The testimony shows that 2,000 cattle were weighed at

scale No. 15 on August 24, 1959. The evidence discloses that in a run of that number there are often 30 or 40 subject animals and a considerable number are wild. No witness relates that he knew how many were wild on August 24, 1959, and several say there might have been a considerable number of them. Some witnesses who testified as to a wild cow passing through the scales that day do not describe it or relate it to the one purchased by the defendant and it is impossible to tell whether they are describing the one so purchased or another.

The evidence shows drivers generally are free to use the alleys at any time. Cattle at any time may be driven to and from pens, scales, or chutes throughout the Stock Yards. The alleys at the place of injury were in close proximity to scale No. 15 which handled a large number of cattle. Other cattle might have been driven in the main north-south alley or across it near the scales at or near the time of the injury. There is a total lack of any evidence concerning the run of other cattle at or about scale No. 15 on August 25, 1959, the day when the plaintiff was injured, or as to incidents on that day concerning wild cattle or subject ones at the scale. The witnesses were not interrogated in that regard concerning that day though several of them testified they were then in attendance at the scale.

From a description of the offending animal, which appears lacking in a most essential feature, and from some evidence of the proximity of the time of the injury to the driving of the defendant's cattle, the plaintiff urges the evidence is sufficient. He claims the jury might infer that the cow escaped from the defendant's driver; that the gates behind the cattle were not closed on the one hand, or were closed without taking the defendant's cow south of them in the alley on the other hand; and also that the subject cow hid in the recess to one of the gates of the Buchanan alleys. All of this plaintiff contends may be inferred, though there is no

other evidence that any such events really happened.

In Mischnick v. Iowa-Nebraska Light & Power Co., 125 Neb. 598, 251 N. W. 258, this court, citing St. Marys Gas Co. v. Brodbeck, 114 Ohio St. 423, 151 N. E. 323, said: "* * * negligence cannot be predicated upon an inference drawn from another inference, for it is well settled that actionable negligence may not be predicated upon an inference drawn from another inference, but if the negligence is only supported by an inference, such inference must be supported by some fact established by direct evidence."

In Mimick v. Beatrice Foods Co., 167 Neb. 470, 93 N. W. 2d 627, this court laid down the following rules: "An appeal from an order of the district court granting or denying a motion for a judgment notwithstanding the verdict requires this court to consider the entire record and to determine whether it does or does not justify the action of the trial court.

"Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination.

"The burden of proving a cause of action is not sustained by evidence from which negligence can only be surmised or conjectured."

In 86 C. J. S., Torts, § 59, p. 984, it is said: "Where there are two or more possible causes of injury, for one or more of which defendant is not responsible, plaintiff, in order to recover, must show by evidence that the injury was wholly or partly the result of that cause which would render defendant liable. If the evidence in the case leaves it just as probable that the injury was the result of one cause as of the other, plaintiff cannot recover." The same rule is set forth in 65 C. J. S., Negligence, § 244, p. 1089.

In Bowerman v. Greenberg, 142 Neb. 721, 7 N. W. 2d 711, this court said: "The evidence fails to disclose the

cause of the plaintiff's fall. We can only surmise and speculate as to its cause, and a verdict cannot be based on mere speculation or conjecture."

As held in Bowers v. Kugler, 140 Neb. 684, 1 N. W. 2d 299: "Negligence is not presumed; the mere happening of an accident does not prove negligence.

"The burden of proving a cause of action is not sustained by evidence from which negligence can only be surmised or conjectured."

In view of all the evidence in the case we are of the opinion that the plaintiff only established that the offending animal was possibly that of the defendant and that it is equally as possible or probable that the injury was caused by some other animal. The evidence leaves it a matter of speculation or conjecture as to whether or not the animal belonging to defendant caused the injury. In such a case the cause should never have been submitted to a jury and the motion for judgment notwithstanding the verdict should have been sustained.

The judgment is reversed and the cause remanded with directions to sustain the motion of the defendant Rothschild for judgment notwithstanding the verdict.

REVERSED AND REMANDED.