VINCENT CASTER, APPELLANT AND CROSS-APPELLEE, V.
DALLAS MOELLER, APPELLEE AND CROSS-APPELLANT.
125 N. W. 2d 89

Filed December 6, 1963. No. 35453.

John McArthur, for appellant.

Thomas E. Brogan, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This action was brought by Vincent Caster, plaintiff and appellant, against Dallas Moeller, defendant and appellee, to recover damages for personal injuries sustained in a collision between two trucks which occurred on U. S. Highway No. 275 at a point a little more than 2 miles west of West Point, Nebraska. The accident took place at about 11 o'clock on the night of June 29, 1960.

A trial to a jury resulted in a verdict and judgment in favor of plaintiff in the sum of $2,000.

Plaintiff filed a motion for new trial and defendant, who had made motions for a directed verdict at the close of plaintiff's evidence and after both parties had rested, made a motion for judgment notwithstanding the verdict.

The trial court overruled both motions. The plaintiff has appealed and the defendant has cross-appealed.

The plaintiff assigns error by the trial court in withdrawing from the jury the question of loss of earnings and the question of permanent injury as elements of damage. He also alleges error in the court's giving instruction No. 3 on its own motion, this being the instruction by which those issues were withdrawn.

The defendant alleges there was error in overruling

his motions for a directed verdict and the motion for judgment notwithstanding the verdict.

The defendant urges the plaintiff was guilty of contributory negligence more than slight as a matter of law. That question will be discussed first since if true it would dispose of the case. Certain aspects of defendant's contention relate to damages and will be discussed on considering plaintiff's assignments of error.

The defendant invokes the rule set forth in the case of Malcolm v. Dox, 169 Neb. 539, 100 N. W. 2d 538, that: "Where the negligence of the plaintiff is shown to be more than slight as a matter of law by the evidence adduced by the plaintiff, it is the duty of the trial court to direct a verdict for the defendant."

In considering the contention of the defendant in the present case we must be governed by the usual rules. "In an action wherein there is any evidence which will support a finding for a party having the burden of proof, the trial court cannot disregard it and direct a verdict against him." Bland v. Fox, 172 Neb. 662, 111 N. W. 2d 537.

"A motion for a directed verdict must, for the purpose of a decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and said party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the facts in evidence." Bland v. Fox, *supra.*

No extended recitation of the evidence is necessary in considering this aspect of the case. The collision occurred in the nighttime when the truck being driven by the plaintiff was struck on its rear left end by the defendant's truck which had followed it as the defendant driver attempted to pass the truck driven by the plaintiff. The plaintiff was driving his employer's truck in a westerly direction on U. S. Highway No. 275. He was having some difficulty because it had been heating

and steam was escaping from the radiator. Immediately preceding the accident in order to procure water from the road ditch, plaintiff was preparing to stop. The plaintiff testified his foot was released from the accelerator but he had not applied the brake, the truck had not stopped, and its movement was merely slowing.

There was a dispute as to whether plaintiff's truck was properly lighted. The plaintiff and two other witnesses testified that the truck had proper clearance lights, a tail light, and red reflector lights. It is conceded it had no turn signal light but there was evidence that the plaintiff's truck was driven straight ahead and its course never varied.

There was evidence that the plaintiff's truck was stopped or nearly stopped without any lights or without being properly lighted; that no signal had been given of his intention to slow down or stop; and that no flare or other warning was provided at its rear.

It seems clear that the jury might have inferred from this disputed evidence that the defendant was negligent in following the truck driven by plaintiff so closely he could not bring his truck to a stop or turn to the left of the plaintiff's vehicle and avoid the accident, or that he did not maintain a proper lookout or have his truck under proper control. The jury might also have inferred the plaintiff was guilty of contributory negligence in stopping his truck which was unlighted and without proper warning signals.

We cannot however on this disputed evidence conclude that the plaintiff was guilty of contributory negligence more than slight as a matter of law.

The issues of the defendant's negligence and the plaintiff's contributory negligence were all properly submitted to the jury and were determined in the plaintiff's favor by the verdict.

We find the contentions of the defendant in assigning error to the trial court in not sustaining the motion

for judgment notwithstanding the verdict to be without merit.

We next consider the plaintiff's contentions that the court erred in withdrawing from the consideration of the jury the issue of damages for loss of earnings, future loss of earnings, and future injuries or damages, together with the defendant's claim that any damages to the plaintiff arose wholly from a congenital defect and were not attributable to the accident.

At the time of the accident plaintiff was 20 years of age. He was employed by Grain Storage Construction Company of Council Bluffs, Iowa. His work consisted of building and repairing grain elevators and previous to the accident he was engaged in work on a grain storage facility at Wayne, Nebraska. He testified he received $1.75 base hour pay and on a regular week he earned $128.50.

The only evidence with respect to the injuries to the plaintiff is that related by the plaintiff himself and Doctor Stone who attended him and who was called to testify on his behalf, and a Doctor Wilke, who was called by the defendant. Their evidence in this respect will now be reviewed.

On direct examination the plaintiff testified his truck was turned around and thrown into the north road ditch. The impact threw plaintiff and his companion out of the cab and into the ditch in which there were 2 feet of water. The plaintiff landed partly on the ground and partly in the water. His passenger, a fellow employee of the same company, was still in the water and plaintiff picked him up and carried him to the side of the road. Prior to the accident he had never had any back difficulty or any pain of any kind in his back, nor had he had any unusual sensations in it. Although he had been in an accident in Colorado, he was not hurt at that time. After the accident described he was pretty sore and had considerable pain in his back which he first realized when he carried Tompkins, his companion, to the side

of the road. It felt like someone had hit him pretty hard on the back just above the hipline and it never went away.

Plaintiff continued to work for the same company after the accident but lost about a week's time right after the accident because of the condition described. After that he worked 2 or 3 weeks during which time his back was "pretty sore." At the end of this period it got worse one day and he missed 2 days of work. It was more than 9 months before he consulted a specialist and during that period if he did too much work or lifting, his back started bothering him and he would miss 2 or 3 days in a row. This happened 2 or 3 times a month.

At the expiration of the 9-months' period he went to Dr. Troester in Hampton, Nebraska, who referred him to Dr. Stone at Lincoln, Nebraska. Dr. Stone examined him first in the forepart of April 1961, and put him in a brace with steel bars running up and down each side of his backbone with a steel strap around the top and one around the hips. This brace was worn 15 months during which period he saw Dr. Stone from time to time. In July 1961, he went to a hospital and was in traction 4 days. This consisted of putting a belt around his hips and a weight over the foot of the bed to try stretching his backbone. In September 1961, he had a spinal fusion on his back which was done at the hospital by Dr. Stone. After his release he did not feel good and had considerable pain in his lower back and hip. He followed the doctor's advice and did not return to work until June 1962, during which time he was under the care of Dr. Stone. He returned to work as soon as the doctor would permit. At the time of the trial he was engaged in light carpenter work. It is not shown what he was then earning. The company he was working for at the time of the accident had gone out of business. At the time of the trial his lower back was stiff and he leaned forward somewhat. If he straightened up it felt

rather uncomfortable. He also said he could not bend over as "good" as formerly.

On cross-examination, plaintiff testified he was taken to the hospital at West Point on the night of the accident in an officer's car, but was not confined there. He went to Hampton, his permanent home, for the Fourth of July during the time he was off work after the accident. At the time of the accident he had been working in Wayne for 3 weeks and that job was nearly completed. After that he continued to work for the same company, doing the same type of work. He was a carpenter and cement finisher. The work depended somewhat upon the type of weather. From Wayne he went to Blencoe, Iowa, and continued to work there the rest of the season. His first consultation with a doctor was the following April.

Dr. Frank P. Stone who testified on behalf of the plaintiff is an orthopedic physician and surgeon licensed and practicing in Lincoln, Nebraska. Besides general practice he is examiner for the rating board for the Veterans Administration at Lincoln and consultant in orthopedic surgery for the Air Force Base, the University of Nebraska, and the Lincoln school board. Dr. Stone saw plaintiff for the first time on April 5, 1961, when plaintiff was referred to him by Dr. Troester of Hampton. He took a history of plaintiff at that time which told him of the accident. Plaintiff related that thereafter he had continued to have a certain distress, pain, and aching through the lower or lumbar portion of his back. The doctor examined his build, development, gait, and actions upon making various movements required of him. His back was examined with reference to any deformities or curvature or evidence of straining, twisting, or muscle spasms. At that time he did not appear in acute pain. The doctor speaks of the examination as though made by several persons, speaking in the plural. As they ran their hands down along the spine they came onto an area which the doctor referred to as a "step off defect." This made them suspicious at once of a condition known

in medical terms as spondylolisthesis. This is the forward displacement of a lumbar vertebra and in this case of the fifth lumbar vertebra. They thought they could prove this by further X-rays. The X-ray tests were made and revealed that he did have a true spondylolisthesis. Certain special right and left oblique views indicated there was a lack of bony formation or fusion on both the right and left side of the fifth lumbar vertebra which would permit this to slip forward. They noted and indicated to the patient that what they were seeing was something that probably had been present for many years, as a matter of fact probably since birth. Without X-rays previous to the accident they could not determine whether or not any slipping had taken place at the time of the alleged accident or whether it had been present for many years. As far as they were concerned it didn't make any difference, as he definitely had what they called a congenital anomaly or defect. This is a lack of bony fusion or the coming together of certain parts of the fifth lumbar vertebra which permits the body of the vertebra to slip forward on certain occasions. In the plaintiff's case this space that should be filled with bone consists of either fibrous or cartilaginous tissue and is not expected to maintain body weight and the thrusts and twists that the normal vertebral body should be able to take. It was the opinion of orthopedic surgeons that this was congenital and that the die was cast "when the baby is born."

This condition is not unusual. In making examination for sports at the University of Nebraska they probably pick up 15 or 25 of such "backs" every year. These persons are turned down for participation in most strenuous sports. This is because such a back is more subject to being damaged than a normal back. If such a person was never hurt or X-rayed, he would have no way of knowing his condition unless a physician examining him became suspicious by reason of the step-off condition.

On completion of the examination and on the basis

of the anatomical findings, the doctor concluded plaintiff had an acute lumbosacral strain. He then prescribed a low-back brace to see if the condition improved, this being the more conservative treatment. This brace was fitted on April 10, 1961. On the May 5th following, though he was somewhat improved, padding on the brace was added because of his having bony prominences making it uncomfortable. On July 17, 1961, he stated to the doctor that his condition had not improved greatly. He was advised to go the hospital and be placed in traction which he did on July 25, 1961, and so remained until July 29, 1961. On August 12, 1961, plaintiff said he felt pretty well as long as he had the brace on but the old pain and aching occurred whenever it was off. An operation was then discussed and plaintiff was admitted to the hospital on September 8, 1961, and an operation was then performed. He was dismissed after surgery on September 17, 1961. The surgery consisted of putting the patient under an anesthetic; making an incision along the midportion of the back at the level of the fifth lumbar vertebra and sacrum; exposing the area to the bone and roughing it with an osteotome, similar to a chisel; placing some bone taken from the patient's hip into the exposed area; and allowing the muscles to come back and be sewed around it. When successful, as in this case, a solid bony mass is formed at the level of the fourth and fifth vertebrae and sacrum which eliminates pain. After discharge he wore a low-back brace constantly and was advised to do nothing strenuous and no unusual turning, bending, stooping, or lifting, and this was to continue 6 months. He was seen again November 1, 1961, when he was getting along well. X-rays were taken March 14, 1962, which disclosed an excellent bony fusion. He was then advised he might go without a brace part-time as he could tolerate it. On May 7, 1962, he was doing quite well and was not complaining of unusual pain. The doctor then fitted him with a corset to assist him in gradually getting away

from the brace. When last seen on September 19, 1962, he appeared to be doing well and was not wearing a brace although he occasionally put it on in heavy lifting or working. He was advised to do the work he could tolerate thereafter.

The doctor gave it as his opinion from his examinations and the history given by the patient, which he said was based on reasonable medical certainty, that the patient's back disability had its onset at the time of the accident in June 1960. The doctor explained that the patient had told him he had never had any back trouble until involved in this car accident; and that the patient's age was that in which this condition can most often be brought to the forefront by unusual strain or trauma. He considered the plaintiff to have a permanent injury as a result of the surgical spine fusion that was necessary to relieve pain. The doctor stated that two X-rays of the plaintiff in evidence taken after the accident at the hospital at West Point, Nebraska, made him suspicious that the patient had this congenital anomaly present but it could only be proved, and was proved, by the subsequent X-rays taken by him when the plaintiff came to consult him; and that the later X-rays were taken at an angle of 45 degrees from the front side which disclosed the condition.

On cross-examination the doctor reiterated that the congenital anomaly existed in the plaintiff at or prior to birth. The defect in plaintiff's back discussed by him was that instead of there being a bony growth, there was other material between the vertebrae, either flesh, muscle, or cartilage. The 15 to 25 athletes whom he had testified as having this defect came from a group examined out of approximately 135 persons. This condition exists among the general public, but the doctor did not know the percentage of individuals who were so affected. He had observed them in examinations at the Veterans Administration and among his patients. In some instances the condition is first found on an examination

of the back where the "step off" is noticed, in others only through X-ray, and sometimes the X-ray of the step-off showed it was not a spondylolisthesis. He would not say spondylolistheses in the spinal column could have developed without trauma but it might be possible. In his opinion there would have to be some strain to cause it to slip out. It could however have occurred from other accidents, but this accident was the only one given by the patient in his history to him. The X-rays or examinations revealed no fractures or curvature of the spine. He could not tell whether the slipping forward existed from birth, but the condition of the lack of fusion had so existed in his opinion.

On redirect-examination the doctor stated in his opinion the disabling symptoms would have to coincide with the accident that produced what the patient was complaining of when he came for treatment. If the plaintiff was in another accident and felt nothing wrong with his back until the accident of 1960, that would not change his opinion that the 1960 accident was the precipitating cause of his disability. The doctor further stated manual labor or strenuous physical exercise would aggravate the condition.

Dr. Louis J. Wilke, a physician and radiologist of Omaha, Nebraska, testified for the defendant. The doctor testified as to his conclusion drawn from an examination of exhibits Nos. 22 and 23, the X-ray films of the plaintiff taken at the West Point hospital on the day after the accident. He identified exhibit No. 22 of the films as one taken of the lower part of the spine and sacrum of the plaintiff. He described it as a front view, the film being placed at his back and the X-ray taken at right angles; and that you obtain therefrom a view of the patient's bones and soft tissues. From his examination of exhibit No. 22 of these films he stated a minimal curvature of the spine could be seen. No fracture could be identified and there were no other significant comments or readings that could be made therefrom.

Exhibit No. 23 was the mate to exhibit No. 22. It was taken by placing the film on one side of the patient and the X-ray on the other so a lateral view was obtained. This revealed a little exaggerated curvature of the lumbar spine which is called lordosis. One is born with this curve, although in this case it is a little more than you normally see. He said he failed to see any other abnormality or sign of fracture or dislocation. There appeared from the X-rays no evidence of traumatic injury to the spine in the area involved, no fracture, dislocation, or bone pathology, and no abnormal readings, except the curvature and the lordosis, and that such conditions would be considered normal.

On cross-examination the doctor said his testimony was confined simply to these two X-rays; and that he never examined the plaintiff. His specialty was not orthopedics but included obtaining and interpreting X-ray film in all specialties of medicine; that orthopedists and radiologists assist one another; and that each is a specialist in the field of diagnosis and they consult one another but the orthopedist prescribes the treatment. He explained spondylolisthesis much as explained by Dr. Stone. He said there is no evidence of it on the film.

On redirect-examination he reiterated that there was no evidence of spondylolisthesis whatever; and that spondylolisthesis could either appear by a development or due to other causes. One is trauma.

The instruction No. 3 which withdrew from the jury its consideration respecting loss of earnings, either past or future, together with all future disability, reads as follows: "The Court withdraws from your consideration all claims of the plaintiff relating to loss of earnings, future loss of earnings, future disability or other future damages, for the reason that his evidence is insufficient to prove the amount of such damages."

A consideration of the questions before us requires the application of the following rules of law as set forth in the case of Johnsen v. Taylor, 169 Neb. 280, 99 N. W.

2d 254: "Damage which is uncertain, conjectural, or speculative as to the existence, nature, or proximate cause thereof is not the basis of a recovery.

"Damage for permanent injury may not be based upon speculation, probability, or uncertainty but it must be shown by competent evidence that such damage is reasonably certain as a proximate result of the pleaded injury.

"A person to whom another has tortiously caused harm is entitled to compensatory damages therefor if he establishes by proof the extent of such harm and the amount of his damage with reasonable certainty."

In Crecelius v. Gamble-Skogmo, Inc., 144 Neb. 394, 13 N. W. 2d 627, it is stated: "Where different minds may reasonably draw different conclusions from the evidence in a law action the question to be decided is for the jury."

In Struble v. Village of DeWitt, 89 Neb. 726, 132 N. W. 124, this court said: "When the evidence is conflicting as to whether physical conditions existing some time after a personal injury were caused or affected by such injury, the question should be submitted to a jury upon all of the evidence."

The plaintiff contends that the testimony given by Dr. Stone and himself shows that the spondylolisthesis which developed and entailed the subsequent treatment was caused by the accident and that the same evidence is sufficient to show loss of earnings by him both previous to the trial and in the future, as well as permanent disability.

It is apparent from the evidence of Dr. Stone that he based his opinion that the plaintiff's ailments were attributable to the accident on the fact that the initial pain and discomfort in plaintiff's back coincided with his being thrown from his truck. The doctor further stated that plaintiff was at an age when unusual stress or strain would cause the congenital condition in his back to develop into a true spondylolisthesis. His examina-

tion of the X-rays taken at the hospital at West Point after the accident aroused his suspicions that such a condition existed which was proved upon taking further X-rays from a different angle. His opinion, based on the examination and the related history was that the slipping of the vertebra in plaintiff's back arose from the accident. This he said was based on reasonable medical certainty. He further stated he could not say this condition could develop without trauma, but it might be possible. Though there may be certain conflicting statements in the doctor's testimony, the plaintiff is entitled to have it considered in the light most favorable to his contentions. The trial court evidently considered this testimony sufficient to submit the question of recovery for plaintiff's pain and suffering and the ensuing doctor bills to the jury, but withdrew from its consideration any resulting loss of earnings by the plaintiff. We think the evidence was sufficient to submit to the jury the question of whether the plaintiff's injury was the result of the accident and the cause of any resulting damages of which there was adequate proof.

With respect to the sufficiency of proof of loss of earnings the plaintiff's hourly base pay and average weekly income were shown. There was evidence here summarized which if given credence by a jury would show loss of earnings. He continued to work for the same company after his injury. One week's time was lost immediately after the accident. Two days' work was lost 2 or 3 weeks thereafter. Thereafter until consulting the specialist 2 or 3 days were lost 2 or 3 times a month. Plaintiff was hospitalized in traction 4 days and under the doctor's advice did not work until June 1962, after his spinal fusion on September 8, 1961. Some of the evidence as to this loss of time is not as definite as might be desired. We think however the evidence was sufficiently certain for the jury to consider and determine plaintiff's loss of earnings while he worked

for the same company. Also after it went out of business the earnings he had previously received might be considered by the jury as a measure of compensation he might be expected to have earned for his work after hospitalization, when he could not work at all.

In the case before us the rule set out in Colvin v. Powell & Co., Inc., 163 Neb. 112, 77 N. W. 2d 900, is applicable: "Where it has been proved that damage has resulted and the only uncertainty is the exact amount, it is sufficient if the record shows data from which the extent of the injury can be ascertained with reasonable certainty." See, also, Roberts Constr. Co. v. State, 172 Neb. 819, 111 N. W. 2d 767. The issue as to damages in regard to loss of earnings up to the time of trial should have been submitted to the jury.

With respect to future earnings however the plaintiff was last seen by the doctor on September 19, 1962, when he appeared to be doing well and was advised to do work he could tolerate. What he could be expected to do or tolerate thereafter is not shown although Dr. Stone did say manual labor or strenuous exercise would aggravate the condition. Plaintiff testified he was doing light carpenter work. What his earnings then were is not shown from the evidence. Whether he could have done other work is not indicated. What, if any, loss of earning power might result in the future is not shown and cannot be inferred from the record. There is a corresponding lack of proof with respect to the plaintiff's condition in regard to pain at the time of trial. Indeed Dr. Stone testified that on May 7, 1962, the patient had no unusual pain and when last seen on September 19, 1962, he was doing well. The purpose of the operation was to eliminate pain and it appears to have been successful. The trial court did not err in withdrawing the issue of future pain and suffering from consideration by the jury. Johnsen v. Taylor, *supra*.

The plaintiff testified that at the time of the trial his lower back was stiff and he leaned forward some-

what. If he straightened up it felt rather uncomfortable. He said he could not bend over as "good" as formerly. Dr. Stone's testimony describing the operation shows that the plaintiff's fourth and fifth vertebrae and sacrum following the operation were one solid bony mass. This condition would be aggravated on strenuous exercise. It would seem clear the jury could infer from the evidence with reasonable certainty that there would be some permanent disability irrespective of whether pain was involved. The issue of future disability should have been submitted to the jury regardless of whether that disability affected the future earnings of the plaintiff or whether or not future pain and suffering were involved.

From what has been said it appears that the issues with respect to liability have been properly submitted to and determined by the jury and need not again be tried.

The judgment is affirmed in part and in part reversed, and the cause is remanded to the trial court with directions to ascertain the amount of the plaintiff's damage by a new trial of that issue only.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.