JACK F. PAULSON ET AL., APPELLEES, v. BARTON H. FORD, DOING BUSINESS AS NEBRASKA AGGREGATE COMPANY, APPELLANT.

152 N. W. 2d 341

Filed July 21, 1967. No. 36535.

Gross, Welch, Vinardi, Kauffman & Schatz, for appellant.

Lathrop & Albracht, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SMITH, J.

A levee failed, and escaping waters of the Platte River flooded part of plaintiffs' farm north-northwest of Valley, Nebraska. In this negligence action a jury has assessed damages for the harm to plaintiffs. Defendant contends on appeal that causation between his conduct and the levee failure was not reasonably inferable and that excessive damages were awarded.

The river flowed southerly in two channels along the west side of defendant's land and less than ¾ mile west of plaintiffs' farm. The east channel, studded with sandbars and small islands, was 500 to 600 feet wide. It ordinarily carried 75 or 80 percent of the streamflow, which had a sediment bearing load and a tendency toward deposition of sediment.

The levee ran along the left bank of the river for 10 miles. Maintenance was a function of the Union Dike and Drainage District, which had built the structure in 1918. The embankment had a 50-foot base, 2 to 1 or 3 to 1 slope, and 10-foot top used for vehicular travel. It was composed of light soil excavated from parallel borrow pits. One of the adjoining pits was located ½ mile north of a point west of plaintiffs' farm. In that pit water stood 16 feet deep. The levee failed there at an early hour on March 25, 1962.

Defendant, doing business as Nebraska Aggregate Company, had begun production of aggregate from his land in July 1961. The relevant activity took place ½ mile south of the site of the levee failure. During the next several months production was sizable. In an around-the-clock operation employees daily filled 50 railroad cars with aggregate, which amounted to 70 percent of the raw material. The remainder, fine sand, was discharged through a pipe across the levee and into the east channel. The men used a bulldozer to move the accumulation westward. The dump, 20 to 25 feet high with a taper, finally occupied between 17 and 85 percent of the channel width in estimates by witnesses. Re-

peated protests, public and private, had been ignored.

After several days of thaw and on the day before the flood, ice restricted the hydraulic effectiveness of the east channel. A sheet remained at the Leshara bridge, a mile south of the dump. The flow there was relatively minute with no water backed up as late as evening. At the dump site a conservation officer, while walking north 100 yards on the levee, observed a different condition. The water in a day had receded 6 inches to a level 3½ feet below the levee top, but a large ice jam existed in the area. In photographs of the flood the upstream end of the ice jam is located a short distance north of the dump site. Other observations were made in the afternoon and evening by Harry Green, president of the drainage district. He was unaware of any sand boil, although railroad employees were sandbagging the levee top upstream 6 miles. Referring indefinitely to the area of the Nebraska Aggregate Company, Green testified:

"A. It was blocked by an ice jam at this area, and it had been raising for some little time and was getting quite high. Q. Where was the ice jam * * *? A. Well, it was lodged from approximately the sandbar on south or downstream for quite some distance. Q. And could that ice get through there? A. No. * * * It was lodged on the hump in the sand."

Defendant's manager witnessed the levee failure. For several days ice cakes on high water had eaten away at the levee, which was full of trees and brush. His men had checked several sand boils. Although they attacked another one with sandbags and a bulldozer, they could not defend the levee. Removal of foundation material had created a channel under the embankment, which collapsed. Through the wide breach water rushed southeasterly in a 3-foot current across plaintiffs' land. On the third day of the flood a construction company closed the breach.

Plaintiffs' farm had been flooded one other time during

the years 1952 to 1962. In 1960 the levee upstream 6 miles failed because of abnormal runoff. Parts of the Burlington railroad tracks and U. S. Highway No. 275 were washed out. In 1962 the runoff was normal, and detailed information concerning any dangerous condition north of the breach was not shown.

Plaintiffs' theory of factual causation has several elements. The waste sand increased the sediment bearing load of the stream, and the increase contributed substantially to formation of sandbars downstream. Ice cakes lodging against one of the bars created the jam, which raised the water level upstream. Through the pipeline of the sand boil foundation material was removed by hydrostatic pressure, and the levee collapsed. In our opinion the evidence was sufficient to support a reasonable inference that defendant's conduct caused plaintiffs' harm.

Defendant argues that assessment of excessive damages is demonstrated by plaintiffs' petition and testimony of plaintiff Jack F. Paulson. The petition itemized damage of $13,720, the amount of the claim, as follows: (1) Leveling, $1,500; (2) planing, $300; (3) plowing, $200; (4) fencing, $1,200; (5) debris, $200; (6) shelled corn, $220; (7) access road, $600; (8) top soil, $5,500; and (9) unplanted crops for 1962, $4,000. Paulson, a Bachelor of Science in Agriculture and a licensed real estate broker, engaged in farm management. He testified to items (1) through (6) with a total estimate of $3,626, which included $250 for shelled corn. He also valued the farm, 80 acres, before the flood at $48,000 and after the flood at "400, 450 dollars an acre. * * * $32,000 to $36,000." No other evidence of amount as an equivalent to adequate compensation appears in the record.

The district court instructed the jury on damages measured by the value of the shelled corn and by depreciation in the value of the land. Plain language removed the danger of duplication in a recovery. The jury assessed damages at $16,000, which responded to the

upper limit of the totals, $12,250 and $16,250, in the substance of Paulson's testimony.

Significant are the considerable range of post-injury valuations by Paulson in the same breath, the lack of other evidence, the interest of Paulson, and the itemization in the petition. In the state of the record damages are excessive, appearing to have been given under the influence of prejudice. The issue of responsibility, however, should not be tried again. See, Caster v. Moeller, 176 Neb. 30, 125 N. W. 2d 89, rehearing denied, 176 Neb. 446, 126 N. W. 2d 485; Scofield v. Haskell, 180 Neb. 324, 142 N. W. 2d 597.

The judgment is affirmed in part and in part reversed, and the cause is remanded for a new trial on damage issues alone. Costs on appeal are taxed against plaintiffs.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.

CARTER, J., dissenting.

The evidence set forth in the majority opinion does not, in my opinion, establish that the negligent acts of the defendant were the cause of the harm suffered by the plaintiffs to their lands.

The evidence shows that the Union Dike and Drainage District constructed a dike on the left bank of the Platte River in the area involved for a distance of 10 miles. The dike was 50 feet wide at its base and 10 feet wide at the top. Its purpose was to protect adjoining lands against floodwaters. The evidence shows that the defendant owned lands to the east of the dike on which coarse gravel aggregate was being mined for commercial use. In its operations, the defendant returned the fine waste sand over the dike to the river by a sluice pipe. A bulldozer was used to push the waste sand away from the sluice pipe into the river. There is a great variance in the evidence as to the distance the waste sand was pushed into the river, the witnesses estimating the distance as being from 100 to 300 feet of

the 600-foot channel. Protests were made to the blocking of the river which were ignored. The alleged protest of plaintiffs consisted of a discussion of possible hazards not detailed in the evidence. The protest of the Nebraska Game, Forestation and Parks Commission was directed to the blocking of the stream and the pernicious effects on animal and vegetable life within the stream. The protest of the president of the dike company consisted of a warning not to mine gravel aggregate within 150 feet of the land side of the dike, a warning that was admittedly complied with. The foregoing is the extent of the warnings shown by the record.

In 1962, the dike washed out approximately one-half mile upstream from defendant's gravel facility and caused the flood damage that resulted in the present suit. It is the contention of the plaintiffs that the pushing of the waste sand into the river caused the break in the dike and subjects the defendant to liability by virtue of the following chain of circumstances.

The Platte River is a sand-bearing stream. In nature, it contains many sandbars, some temporary in nature and some of more permanent duration as evidenced by vegetation thereon. The amount of sand being carried by the river is dependent largely on the velocity and amount of water at the particular time. The greatest sedimentation occurs in slack waters when velocity is reduced. The action of the waters on sand and sandbars is dependent on many conditions which are practically impossible of determination at any given time. In high water periods, sand may scour out in areas where velocity is high and sandbars may be moved only to form elsewhere. In areas where the velocity of the water is reduced, sedimentation is more likely to occur and sometimes produces sandbars that did not previously exist. The results of river action are notoriously problematical.

The only witness purporting to testify to the origin of the ice jam alleged to have caused the break in the

dike is the president of the dike company. He states that he stood on the Leshara bridge approximately a mile downstream from the break in the dike and viewed the ice jam. He says that the ice jam did not form at the bridge but some distance upstream. He says the ice lodged on a sandbar and piled up behind it causing the jam. There is nothing to indicate if the sandbar was recent or of longstanding, or had any relation to the casting of waste, sand into the river by the defendant. The contention that the waste sand pushed into the river by the defendant caused the ice jam is pure speculation, although the majority opinion treats it as a reasonable inference which the jury could draw from the facts.

I am in agreement with the finding that the ice jam blocked the flow of the stream to an undetermined extent. But it is not the only evidence in the record as the source of the high water at the point of the break in the dike. The evidence shows that the top of the dike was being sandbagged several miles north in the area of Fremont. There is evidence of several weak places that were watched during periods of high water. There was evidence that the moving ice was striking the banks and eroding them to some extent. The claim relied on here, however, is that the break in the bank was caused by a sand boil opening a channel under the dike. There is something said about hydraulic pressure of the high water contributing to the break. I point out, however, that there was a borrow pit containing as much as 16 feet of water along the land side of the dike. The level of the water in the borrow pit raised and lowered with the rise and fall of the level of the river. This, of course, had a tendency to decrease the hydraulic pressure. The depth of the borrow pit could have been an important factor in creating sand boils by permitting the passage of water in the more porous soil aggregates at the greater depth. These factors lessen the probability that the pertinent sand boil was caused by the alleged negligent acts of the defendant.

The evidence shows that the water did not approach the top of the dike by more than 3 feet at the point of the break. The cause of the break in the dike, under the evidence, was the sand boil. Whether or not it was the result of sandy soil used in the construction of the dike, the existence of the borrow pit, or the work of burrowing animals is a matter of pure speculation. It is my opinion that the result of the majority opinion is based on inference on inference on inference, or, what is more likely, speculation on speculation, or a combination of both. The result of the majority opinion is based on a coincidence of events without proof of causal connection. Even though warnings of possible hazards may have been communicated to the defendant or his agents, the burden rests upon the plaintiffs to show that the negligence of the defendant was a legal cause of plaintiffs' harm.

In testing the sufficiency of the evidence to support a verdict, it must be considered in the light most favorable to the successful party. In giving plaintiffs' evidence such weight, I submit that there is no evidence that the dumping of the waste sand caused the break in the dike one-half mile above defendant's facility. The conclusion arrived at by the majority is the result of pure speculation accompanied by a coincidence of events having no reasonable relation to each other. In permitting the evidence in this case to go to the jury, the court authorized the jury to return a verdict for the plaintiffs without evidentiary proof that the legal cause of plaintiffs' harm was the negligence of the defendant.

SPENCER, J., joins in this dissent.