917 F.2d 1065
 Dennis MURDOCK and Sharon Murdock, for themselves and as
parents and next friends of their minor child,
Shawn M. Murdock, Appellants,
v.
EMPLOYERS INSURANCE OF WAUSAU, a Corporation,
v.
UNITED STATES of America, Appellee,
Western Contracting Corporation, Appellee.
 No. 89-2303.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 11, 1990.
Decided Oct. 24, 1990.
 
 John R. Gibson, Circuit Judge, filed a dissenting opinion.
 Denzel R. Busick, Grand Island, Neb., for appellants.
 Steven A. Russell, Lincoln and Robert Grimit, Lincoln, Neb., for appellee.
 Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Dennis Murdock was injured when a section of the Mirdan Canal collapsed upon him while he was working in an excavation adjacent to the canal. Murdock was employed by Western Contracting (Western) with whom the United States contracted to build the canal. Murdock and his family brought suit against the United States to recover damages, asserting that the United States--on notice that a hazardous situation existed--was negligent in failing to take adequate precautions to ensure a safe place to work. The district court entered judgment for the United States. We affirm in part, reverse in part, and remand for action consistent with this opinion.
 
 BACKGROUND
 
 2
 In 1981, the Bureau of Reclamation (Bureau) contracted with Western for the construction of the Mirdan Canal in Nebraska, part of the Pick-Sloan Missouri Basin Program. The contract incorporated detailed specifications as well as administrative and statutory safety standards. The contract provided that the Bureau would continuously inspect construction activities to ensure compliance with the safety and health standards in paragraph 1.1.4 of the contract. Among these standards were the following:[1]
 
 
 3
 The contractor shall not require any laborer ... employed in the performance of the contract to work under conditions which are ... hazardous, or dangerous to his health or safety, as determined under construction safety and health standards promulgated by the Secretary of Labor under section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 327), as amended, and "Construction Safety Standards," published by WRPS (Water and Power Resources Service.)
 
 
 4
 . . . . .
 
 
 5
 "When violations of the safety and health requirements ... are called to the attention [of the contractor] by the contracting officer or his authorized representatives, the contractor shall immediately correct the condition...."
 
 
 6
 In the event the contractor fails or refuses to promptly comply with the compliance directive ..., the contracting officer or his authorized representative may issue an order to stop all or any part of the work.
 
 
 7
 Paragraphs 1.1.4a, d and e.
 
 
 8
 In 1982, early in the construction phase of the project, James Pinkman, Western's senior construction employee, approached Robert McClure, the Bureau's senior construction official, with a proposal that Western be allowed to erect the unreinforced concrete lining of the canal before erecting the abutments for road bridges which would cross over the canal. The canal lining would be supported by the surrounding soil. McClure expressed concern to Pinkman that erecting the canal before the abutments might prove hazardous because significant areas adjacent to the canal would have to be excavated to allow for the abutments. He noted that this procedure would result in undercutting the soil foundation of the canal lining, thereby exposing unreinforced cement to collapse. In order to ensure against collapse, McClure stated that it "will probably be all right but you need to cut off part of that curb to reduce the weight of the overhanging lining." Transcript at 469-70; Deposition of McClure at 26. "Chipping off" the curb and top two or three feet of canal lining became the standard practice at excavation sites throughout the project.
 
 
 9
 The contract required that a bridge be built at Station 372+74. In early summer 1985, an 82-foot long excavation was dug to facilitate the construction of the bridge. The canal lining was left uncut. Pursuant to the contract, the excavation was partially refilled and compacted. On June 12th during the day shift, the foreman for Western, Rick Everist, directed workers to re-excavate the site because the site failed a density test. They did so to a depth of approximately 12 to 14 feet, some four feet deeper than required by the contract.
 
 
 10
 Mark Sintek, a Bureau safety inspector, testified that on June 12th he was at the station twice in the morning and twice in the afternoon. He stated that when he last visited the site during the afternoon, the only equipment in the area was a front-end loader; that the dirt slope from the top of the canal lining wall to the bottom of the excavation area was at an angle of repose of anywhere from one-half to one to one to one; that no more than two feet of the canal wall were exposed; that he knew the concrete lining was unreinforced; that no hand-held soil compactors, "Whacker-Packers," were present at the site; that he told Everist that further excavation of the site was unnecessary; that he told Richard Schwisow, Supervisory Construction Inspector, that the excavation was deeper than necessary; that he was aware that a night shift was working on June 12th; and that some soil compacting work had been done by that shift. He stated, however, that he drove by the site at 7:00 p.m. and observed no activity. He finally testified that he was authorized to call Western's attention to safety violations and to stop all or part of the work if he deemed there to be a safety problem on the job. In a report filed the day after the accident, Sintek stated:
 
 
 11
 Contractor's night shift crew came to work and began compacting material back into overexcavation area when later in shift, material caved in. Canal lining broke along # 1 longitudinal joint. Contractor had been cutting canal lining out at top, down approximately 3 feet to make room to construct bridge abutments. In the area left of where accident occurred, lining was cut too far upstream from where abutments were to be placed, thus the overhanging of canal lining and the undermining of material contributed to the accident as well as lack of proper safety precautions and supervision.
 
 
 12
 Report of Sintek dated June 13, 1985 (emphasis added).
 
 
 13
 Schwisow testified that it was his responsibility to supervise construction activity at the site, that he observed the site at 3:00 p.m. on June 12th, and that he saw a front-end loader in the 12-foot deep excavation at the site. He did not view the excavation area to be unsafe at the time because the banks of the excavation were not sloughing and no workers were in the excavation. He testified that he believed that work--not including backfilling and compacting near the abutment--would continue through the night and that he would talk to Everist about the unnecessary excavation in the morning. In his report of the accident, Schwisow stated:
 
 
 14
 On June 12, 1985, during my daily inspection tour of the Mirdan Canal, Section 1, at approximately 3:00 p.m., I stopped by station 372+74 county road bridge site. I observed a front-end loader excavating the left abutment after a failing test. I asked a laborer that was watching this operation if he knew that they only needed to excavate 8.5 feet below the top of the lining. He said yes, but it appeared that the front-end loader operator was below this several feet. At this time, the material under the 1 1/2:1 unreinforced lining was excavated out to about four feet below the top of the lining on about 1/2:1 slope.
 
 
 15
 . . . . .
 
 
 16
 Sometimes when the crew did not have much to do, they would ... do some dress-up work and minor compacted backfill around structures. This was always checked the next day for densities to check the small amount of backfill being compacted. This was being done with our knowledge and due to the off and on type of work, an inspector was not assigned to watch this work during the night shift.
 
 
 17
 Report of Schwisow dated December 6, 1985.
 
 
 18
 Everist, the day foreman, testified that he spoke with Western's night foreman, Tom Kusek, regarding work to be performed on the night shift. Everist indicated that he wanted the fill adjacent to the abutment to be compacted. He also testified that the night crew generally did not compact fill for bridge abutments but that they occasionally did minor compacting.
 
 
 19
 Murdock was employed by Western as part of the night shift crew. This shift began at 5:00 p.m. That crew was primarily responsible for restocking, running a trimmer machine, and maintenance of the roads used during the day shift. When Kusek observed the site shortly after reporting to work, he testified that two feet of canal lining was exposed. He told Murdock and the other workers at the site to watch for sloughing or movement of dirt within the excavation area. At 8:00 p.m., Kusek left the site. He returned at 11:00 p.m. At that time, he stated that from four to eight feet of the canal lining was exposed.[2] He did not order Murdock and the other employee out of the excavation.
 
 
 20
 At 11:20 p.m., 41 feet of the canal lining at Station 372+74 collapsed on Murdock and another worker. Murdock sustained serious injuries. Deposition Exhibit 1D prepared by C.A. Currie, Bureau Project Safety Manager, depicts the accident. See Appendix. The exhibit shows that the excavation was approximately 12 feet deep, that the curb and approximately two to three feet of lining which normally would have been removed had not been removed in this case, and that the lining broke at a contraction joint about ten feet from the curb.
 
 
 21
 Murdock and his family brought this action against the United States in federal court pursuant to the Federal Tort Claims Act (FTCA) to recover under Nebraska law for damages he sustained as a result of the canal lining falling on top of him. After extensive discovery, both parties moved for summary judgment. The court denied both motions. The matter then proceeded to trial, where the evidence summarized above was introduced. The district court ruled in favor of the government. In so ruling, it stated that "Nebraska law recognizes two exceptions to the general rule that an owner may not be liable for the negligence of an independent contractor."
 
 
 22
 [1.] When the evidence establishes that [an] owner retain[s] control over [a] project.
 
 
 23
 The court found that the Bureau did not retain sufficient control to justify the imposition of a duty to provide a safe workplace.[3] This holding is not clearly erroneous.
 
 
 24
 [2.] When by rule of law or by statute a duty of the owner [is] nondelegable. In Nebraska a duty to take due and suitable precautions devolves upon a party who is responsible for a dangerous place, agency, instrumentality or operation likely to cause injury or damage to persons and this duty is nondelegable.
 
 
 25
 The court assumed that the excavation was a dangerous place of operation but held that the Bureau took due and suitable precautions to ensure a safe workplace.[4] It further held that Murdock was negligent.[5]
 
 DISCUSSION
 
 26
 "To prevail in an action based on negligence, a plaintiff must prove four essential elements: the defendant's duty not to injure the plaintiff, a breach of that duty, proximate causation, and damages." Zeller v. County of Howard, 227 Neb. 667, 419 N.W.2d 654, 657 (1988).
 
 I. THE BUREAU'S NEGLIGENCE
 
 27
 The general rule in Nebraska is that the owner is not liable for physical harm caused to another by the acts or omissions of the contractor or the contractor's employees. Sullivan v. George A. Hormel & Co., 208 Neb. 262, 303 N.W.2d 476 (1981). The owner, however, as the district court noted, remains liable for negligence on the construction site if (1) the employer retains control of the work; (2) Nebraska common law creates a nondelegable duty; or (3) Nebraska statutes create a nondelegable duty. Erickson v. Monarch Indus., 216 Neb. 875, 347 N.W.2d 99, 105 (1984). We believe that the Nebraska common law creates a nondelegable duty running from the Bureau to Murdock.
 
 
 28
 Under Nebraska common law, an owner of land is responsible to ensure that its contractor takes all appropriate precautions in performing an inherently dangerous task. Id. (quoting Witucke v. Presque Isle Bank, 68 Mich.App. 599, 610, 243 N.W.2d 907, 912 (1976)). This " 'nondelegable duty exception is based upon the theory that certain responsibilities of a principal are so important that the principal should not be permitted to bargain away the risks of performance.' " Id. (quoting Arsand v. City of Franklin, 83 Wis.2d 40, 54 n. 8, 264 N.W.2d 579, 568 n. 8 (1978)). The district court did not reach the question of whether the construction at this site was an inherently dangerous activity. It instead held that assuming this fact, the Bureau had not breached its duty to take due and suitable precautions to protect Murdock from injury. In short, it held that no agent of the government acted negligently.
 
 
 29
 Nebraska has squarely faced the issue of whether excavation similar to that undertaken here is inherently dangerous and has decided the issue in the affirmative. See McKinstry v. Cass County, 228 Neb. 733, 424 N.W.2d 322 (1988); Hickman v. Parks Construction Co., 162 Neb. 461, 76 N.W.2d 403 (1956). In Hickman, the Air Force had entered into a contract with a construction company to improve the area adjacent to an officers' club. Part of the improvements included a new wall.
 
 
 30
 The construction of the wall required the digging or excavating of a ditch or trench the length of this south boundary line the purpose of which was to contain the footing and a base for the wall. Accordingly, ... the necessary excavating was done.... The excavation was about 4 feet wide and about 4 1/2 feet deep. In the excavation were placed forms for the pouring of a concrete base for the wall 8 inches thick with a footing of about 1 foot 8 inches. The concrete was poured and the forms removed. The portion of the excavation to the north of the concrete base was backfilled so that the area north from the concrete was relatively even or level. The portion to the south was not backfilled completely if at all.
 
 
 31
 Hickman, 76 N.W.2d at 407. The court held that the excavation, four feet wide by four and a half feet deep and backfilled on one side, was a dangerous place. Id. at 408-09. See also Erickson, 347 N.W.2d at 99 (electrical transformer was a dangerous instrumentality); Crosswhite v. City of Lincoln, 185 Neb. 331, 175 N.W.2d 908 (1970) (a sidewalk where a protruding pipe was located was a "dangerous sidewalk condition"); Colvin v. John Powell & Co., 163 Neb. 112, 77 N.W.2d 900 (1956) (molasses barrels tainted with poison were dangerous instrumentalities); cf. Pendleton Woolen Mills v. Vending Assoc., Inc., 195 Neb. 46, 237 N.W.2d 99, 102 (1975) (the Court did "not believe that the pop machine involved in this case could be considered a 'dangerous instrumentality' "). Thus, the district court's assumption that the Bureau had a nondelegable duty to take due and suitable precautions to ensure a safe workplace is correct.
 
 
 32
 The Nebraska view reflects the position of the Restatement of Torts (Second).
 
 
 33
 Sec. 427. Negligence as to Danger Inherent in the Work
 
 
 34
 One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.
 
 
 35
 Restatement of Torts (Second) Sec. 427 (1965). The Restatement further explained:
 
 
 36
 The rule stated in this Section is commonly expressed by the courts in terms of liability of the employer for negligence of the contractor in doing work which is "inherently" or "intrinsically" dangerous. It is not, however, necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others, or that it be of a kind which involves a high degree of risk of such harm, or that the risk be one of very serious harm, such as death or serious bodily injury.
 
 
 37
 Id. Sec. 427 Comment b. See also Zrust v. Spencer Foods, Inc., 667 F.2d 760, 765 (8th Cir.1982) (the Nebraska Supreme Court frequently and extensively relies on the Restatement of Torts, particularly in the area of worker safety).
 
 
 38
 As noted above, under the inherently dangerous doctrine, the Nebraska Supreme Court has held that an owner must take all appropriate precautions to ensure that an inherently dangerous task is safely completed. Erickson, 347 N.W.2d at 105."The doctrine, in short, says that the principal is negligent, and hence liable, because it has allowed the independent contractor to be negligent in performing the job. There is a nondelegable duty to see that the work is done with the requisite degree of care."
 
 
 39
 Id. (quoting Witucke v. Presque Isle Bank, 68 Mich.App. 599, 610, 243 N.W.2d 907, 912 (1976)). While some states have held that employees of independent contractors do not benefit from the nondelegable duty rule arising from inherently dangerous work, see Vagle v. Pickands Mather & Co., 611 F.2d 1212 (8th Cir.1979) (construing Minnesota law), the Nebraska Supreme Court has allowed employees of independent contractors to recover under this doctrine, see Simon v. Omaha Public Power District, 189 Neb. 183, 202 N.W.2d 157, 164 (1972); see also Giarratano v. Weitz Co., 259 Iowa 1292, 147 N.W.2d 824, 834 (1967); Mallory v. Louisiana Pure Ice & Supply Co., 320 Mo. 95, 6 S.W.2d 617, 624 (Mo.1928) (en banc).[6] Thus, the question is whether in this dangerous place the Bureau took due and suitable precautions to protect Murdock from injury.
 
 
 40
 Officials from both the Bureau and Western admitted that the unsupported, unreinforced canal lining was apt to collapse and thereby posed a significant risk to employees working adjacent to the lining. Murdock v. United States, No. 86-L-492, Transcript at 469-70 (D.Neb. Sept. 6, 1989) (testimony of McClure, Bureau inspector) [Tr.]; Murdock v. United States, No 86-L-492, Deposition of McClure at 24-26 (D.Neb. March 15, 1988) [Depo. of]; Depo. of Walter Long, Chief of the Water Conveyance Branch for the Bureau, at 44-45; Depo. of Thomas Haider, Bureau designer of the canal, at 28-29. The Bureau and Western agreed upon a procedure to ensure workers' safety. Id. This procedure involved "chipping off" the curb and the top two or three feet of the canal lining in the area in which the work was to be performed. Two separate Bureau inspectors viewed the excavation several times on June 12th and were aware that neither the curb nor the top two or three feet of the lining had been "chipped off" in the area near the bridge abutment. Tr. at 43, 77, 82, and 1044 (inspectors Sintek and Schwisow); Depo. of Sintek at 20-21, 45-46; Depo. of Schwisow at 25, 56. They were also aware that the soil in the area was sandy and prone to sloughing. They knew that the excavation had to be refilled and compacted, partially by hand. They were also aware that on occasion hand compacting was done by the night crew. Tr. at 152, 153, and 819; Depo. of Kusek at 13-14. No slide protection was placed on the banks of the excavation, nor was the canal lining braced. See Tr. at 87, 112-114, 1100-1101, 1115, 1133-1134.
 
 
 41
 Sintek and Schwisow's testimony regarding the extent to which the concrete lining was exposed at that time and the angle of repose of the earth supporting the canal lining is implausible. Both Schwisow and Sintek stated that the angle of repose of the earth supporting the canal lining at or about 4:00 p.m. was approximately one to one and that only two or three feet of the canal lining was exposed. These witnesses cannot be right in both particulars. If only two or three feet of the canal were exposed, the angle of repose would have to have been significantly steeper, thereby increasing the probability that there would be extensive sloughing of earth from under the canal lining. See Appendix (line B). On the other hand, if the angle of repose was in fact one to one, then approximately ten feet of the canal lining would have had to have been exposed. See id. (line A).
 
 
 42
 The district court took the position that even if the condition at the site was a dangerous one, the Bureau cannot be held responsible for Murdock's injury because the Bureau did not believe that employees would be compacting soil in the excavation during the night shift. There are three answers to this assertion. First, undisputed evidence indicates that some tamping and compacting in excavations had been done by night crews in the past. Undisputed evidence also indicates that the Bureau was aware of this fact. Thus, the Bureau should have anticipated that workers might well work in the excavation on the night in question, and consequently the Bureau should have taken the steps necessary to protect them.[7] This was a part of its nondelegable duty.
 
 
 43
 Second, even if the Bureau did not believe that the night shift crew would be working in the excavation, it knew that the contractor had the right to require the night shift to compact soil in the excavation and that compacting the soil in the excavation might be dangerous since the uncut canal lining posed a danger to anyone working in the excavation. In light of its nondelegable duty, the Bureau had the responsibility to enter an order requiring the contractor to refrain from any further activities in the excavation until the unsafe conditions had been corrected.
 
 
 44
 Third, the government knew that hand compacting in the excavation was necessary, that the employees doing that compacting would have to work under the canal lining, and that it was unsafe for them to do so. Thus, irrespective of when the work was to be performed and because the inspectors knew that they would not be at that site at all times when work was being performed, the Bureau had an obligation to issue a stop order until the unsafe condition was remedied. In light of the obvious safety violation, the Bureau had the right and the duty to enter a stop work order at this site until the unsafe conditions had been corrected.[8]
 
 II. CONTRIBUTORY NEGLIGENCE
 
 45
 The district court held in a single sentence that Murdock was negligent. It refrained from determining whether Murdock's negligence was sufficient under Nebraska law to bar his recovery. In Nebraska, an "actor is contributorily negligent if (1) he or she fails to protect himself or herself from injury, (2) his or her conduct concurs and cooperates with the defendant's actionable negligence, and (3) his or her conduct contributes to his or her injuries as a proximate cause." E.g., Howells Elevator v. Stanco Farm Supply, 235 Neb. 456, 455 N.W.2d 777, 781 (1990). Nebraska law provides, however, that a plaintiff's negligence "shall not bar a recovery when the contributory negligence of the plaintiff was slight and the negligence ... of the defendant was gross in comparison." Neb.Rev.Stat. Sec. 25-21,185. We read the district court's opinion as leaving open the question of whether Murdock's negligence was slight as compared with that of the Bureau. If it was slight, then Murdock is entitled to recover damages, the amount to be determined in accordance with the Nebraska Comparative Negligence instruction.[9]
 
 
 46
 The Bureau vigorously asserts in its brief that there is clear evidence supporting the district court's finding that Murdock was negligent. It would have been helpful to us if the district court had stated its reasons for this finding. Nonetheless, we are not prepared to hold that that finding was clearly erroneous. We emphasize, however, that the district court did not find that Murdock's negligence was sufficient to bar his recovery. We leave that decision to the district court. Our silence on this issue is not intended to indicate acceptance of the government's contention in its brief on this issue.
 
 III. DISCRETIONARY FUNCTION EXCEPTION
 
 47
 The district court held that the Bureau's conduct was not protected by the discretionary function exception found in the FTCA. It concluded, relying on McMichael v. United States, 856 F.2d 1026 (8th Cir.1988), that the decision of Bureau employees not to stop work earlier in the day at the site where the accident occurred fell outside of this exception because the employees' duties included ensuring that all unsafe practices were corrected immediately. Murdock v. United States, No. 86-L-492, slip op. at 15-16 (D.Neb. Nov. 30, 1988).
 
 
 48
 28 U.S.C. Sec. 2680(a) eliminates the FTCA's authorization for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." In determining whether the challenged conduct falls within this exception, we first ask whether the action or inaction is a matter of choice for the acting employee. Dalehite v. United States, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953); McMichael, 856 F.2d at 1031. "If the challenged conduct does, however, involve an element of judgment, we must then determine whether that judgment is of the kind that the discretionary function exception was designed to shield." McMichael, 856 F.2d at 1032.
 
 
 49
 We agree with the district court that the analysis and result in McMichael control this case. In that case, we held that the government's initial decision to set forth certain policies was within the discretionary function exception but that the government's failure to comply with its own policies fell outside its scope. Id. at 1033. Likewise, the Bureau's decision as to what procedure should be followed when excavating near bridge abutments is within the exception, but the Bureau's failure to ensure that that procedure was followed is outside the scope of the exception. See also E. Ritter & Co. v. Department of the Army, 874 F.2d 1236, 1241 (8th Cir.1989) (focusing on whether the government's conduct involved policy concerns).
 
 CONCLUSION
 
 50
 We affirm in part, reverse in part, and remand to the district court with directions to it to enter judgment against the Bureau on the question of liability, to determine whether Murdock's negligence was more than slight, to determine the extent of Murdock's damages, and to determine the extent, if any, to which these damages should be reduced because of Murdock's negligence.
 
 
 51
 JOHN R. GIBSON, Circuit Judge, dissenting.
 
 
 52
 I respectfully dissent. I would affirm the judgment of the district court.
 
 
 53
 First, I am satisfied that the district court did not err in its finding that the government did not retain sufficient control over the project to justify the imposition of a duty upon it. I agree with the district court that the facts in this case are substantially different from those in McMichael v. United States, 751 F.2d 303 (8th Cir.1985), appeal after remand, 856 F.2d 1026 (8th Cir.1988). Our later McMichael decision stressed that a 51-part checklist contained a specific requirement that the contractor comply with an electrical storm procedure, and, in the event of an electrical storm, the defense contract administration personnel were to evacuate areas of the building that contained explosive materials. 856 F.2d at 1033. In McMichael, this mandatory duty of evacuation was violated, the government inspectors had no discretion, and the discretionary function exception was held inapplicable. Id. at 1033-34. In the case before us, however, government employees exercised control of a far more general nature. The district court did not err in concluding that the government's control was "markedly lower" than that found in McMichael. Murdock v. United States, No. CV86-L-492, slip op. at 6 (D.Neb. Nov. 30, 1988).
 
 
 54
 The determinative issue in this case is whether Bureau employees Mark Sintek and Richard Schwisow were negligent because they failed to issue stop orders. The district court made detailed findings on this subject, concluding that these employees had exercised reasonable precautions in the performance of their duties regarding the excavation and that neither Sintek nor Schwisow nor any other government agent acted negligently. The district court stated:
 
 
 55
 Sintek testified that he did not believe that the workers in the excavation were in imminent danger. The only workers who [sic] he saw in or near the excavation were the loader operator and a worker who was watering the walls of the excavation from above the hole. He did not recall ever seeing workers using whackers in excavations in which abutments had not already been placed. He had "eyeballed" the slopes on each of his visits to the site and had found that they were approximatley [sic] 45 degrees. He also attempted to inform Western's foreman of the unnecessary overexcavation and he informed his own supervisor of his concerns about the unnecessary excavation.
 
 
 56
 Schwisow's testimony, in addition to his testimony recounted above, established that he observed the site at the end of the normal workday and that he had no knowledge that the night crew would be working in that particular excavation that night. There was testimony that the night crew, until the night of the accident, had never worked with whackers in a bridge abutment excavation on this project, although the night crew had previously worked with whackers to compact the soil around abutments after they had been placed.
 
 
 57
 The testimony also showed that safety inspectors were not assigned to the night crew as a matter of course. The exception to this policy arose when the work that was performed by the night crew had to be ready to go the following morning so that the day crew could begin another task immediately. Wilson, the chief inspector, testified in his deposition that he probably would have assigned an inspector to the night crew had he known that the excavation was to be backfilled and compacted, but that he had no way of knowing that workers would be there because the contractor did not inform the Bureau of any plans to have workers there. Based on this evidence, I conclude that the defendant's agents exercised reasonable precautions in the performance of their duties regarding the excavation.
 
 
 58
 Id. at 7-8.
 
 
 59
 These factual findings must be reviewed under the clearly erroneous standard. The court today, however, ignores its obligations as spelled out in Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985), and engages in its own fact-finding in determining that Bureau employees were negligent. Two specific factual findings are the foundation for the district court's findings of negligence. First, until the night of the accident, the night crew had never worked with whackers in a bridge abutment excavation on this project, although they had used whackers to compact soil around abutments after the abutments had been placed--a later stage of the construction than was involved here. Second, neither Sintek nor Schwisow knew that the night crew would be working in that particular excavation that night. These findings are supported by the testimony of these individuals. Sintek testified that he had never observed a hand-held soil compactor in an excavation area before the placement of a bridge abutment. (Tr. 156). Sintek was never told by any representative of the contractor, Western, that a night shift crew would be working in the excavation that night. (Tr. 176). Schwisow also testified that he had never seen hand-held soil compactors in an excavation area before the placement of a bridge abutment on an abutment footing (Tr. 1144-45), and that he was not informed the night shift would be working in the excavation area that night. (Tr. 1154).[10]
 
 
 60
 The testimony of Sintek and Schwisow supports the findings of the district court. Insofar as there may have been differing testimony, the district court had the responsibility of resolving the conflicts. Bessemer City makes clear that "[t]he reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court." 470 U.S. at 573, 105 S.Ct. at 1511. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 573-74, 105 S.Ct. at 1512.
 
 
 61
 The court today ignores these mandates and reduces the eight-day trial before the district court to nothing more than a " 'tryout on the road.' " Id. at 575, 105 S.Ct. at 1512. The detailed discussion of the evidence in this court's opinion, at 1071-1072, demonstrates that the majority is making its own factual analysis and abandoning its responsibility to apply the clearly erroneous standard to the district court's findings. To do so is error.
 
 
 62
 I further take issue with the court's discussion of the discretionary function exception. The district court in its earlier order, on motion for summary judgment, held that the discretionary exception did not apply. In its later order following the trial, it is evident that the court analyzed the testimony in a far more detailed and fact-specific way. The district court did not give further consideration to the discretionary function exception based upon the more fact-specific inquiry at trial. The issue was not raised on appeal by the government. I believe the court's discussion today is unnecessary. In view, however, of the reversal, I believe that it would be appropriate for the district court to reexamine the issue of the discretionary function exception on the basis of the expanded factual record and findings. I believe a close examination will show that the facts of the second McMichael decision are distinguishable from the facts of this case.
 
 APPENDIX
 
 63
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 The district court mistakenly held that the language of paragraph 10 of the contract, which provides that the quality inspection requirements of paragraph 10 are for the sole benefit of the government, applies equally to the health and safety standards set forth in paragraph 1.1.4. Paragraph 10 provides:
 (a) All work (which term includes but is not restricted to materials, workmanship, and manufacture and fabrication of components) shall be subject to inspection and test by the Government at all reasonable times and at all places prior to acceptance. Any such inspection and test is for the sole benefit of the Government and shall not relieve the Contractor of the responsibility of providing quality control measures to assure that the work strictly complies with the contract requirements. No inspection or test by the Government shall be construed as constituting or implying acceptance. Inspection or test shall not relieve the Contractor of responsibility for damage to or loss of the material prior to acceptance, nor in any way affect the continuing rights of the Government after acceptance of the completed work under the terms of paragraph (f) of this clause, except as hereinabove provided.
 The health and safety standards are for the benefit of the government and for the workers employed on the job, while the quality standards are solely for the protection of the government.
 
 
 [2]
 Murdock testified that at 11:00 p.m. from ten to twelve feet of canal lining was exposed
 
 
 [3]
 On the parties' motions for summary judgment, the district court held, on the facts before it at that time, that the government retained sufficient control over the project to justify the imposition of a duty to provide Murdock a safe place to work. After trial, the court found the trial testimony of Bureau employees regarding the Bureau's actions when one of its employees became concerned over the safety at the construction site to be significant. It then held that the Bureau did not retain control. It further held that no unfair prejudice resulted from its change. We agree. The trial court had the right to consider all evidence. Thus, it was not a violation of due process for the court to revise its opinion regarding the Bureau's control after trial
 
 
 [4]
 The district court held that the Bureau owed Murdock no statutory duty under Nebraska law. Murdock v. United States, No. 86-L-492, slip op. at 16-17 (D.Neb. Nov. 30, 1988). See n. 8, infra. It also held that the Bureau exercised due care in designing the canal. Id. at 9. We agree with this latter conclusion
 
 
 [5]
 The court stated it would not decide "whether the extent of his negligence would be sufficient to bar his recovery" under Nebraska law. Id. at 9
 
 
 [6]
 Our review of Nebraska case law, particularly Erickson, Hickman, McKinstry, Simon, and Johnson v. Weborg, 142 Neb. 516, 7 N.W.2d 65 (1942), indicates that the owner is not a guarantor but instead has a separate and distinct duty to ensure that adequate precautions are taken
 
 
 [7]
 For this reason, it is clear that the Bureau's negligence proximately caused Murdock's injuries
 
 
 [8]
 An argument can also be made that the Bureau breached a nondelegable duty under Neb.Rev.Stat. Sec. 48-425, which provides that "[a]ll ... supports ... used in the erection ... of any bridge ... or other structure shall be erected and constructed in a safe, suitable and proper manner." This statute imposes a duty to ensure that the earthen support of the canal lining during the construction process was safe. In light of our holding that the Bureau breached its common law nondelegable duty, we need not reach this issue
 
 
 [9]
 The Nebraska Comparative Negligence instruction from the Uniform Instructions states in part:
 Negligence
 NJI 2.02A
 CONTRIBUTORY AND COMPARATIVE
 NEGLIGENCE
 a. If upon comparison you decide that the plaintiff's negligence was more than slight, or that the defendant's was less than great, then your verdict must be for the defendant.
 b. If, however, upon comparison, you decide that the plaintiff's negligence was slight and that the defendant's was gross, then your verdict must be for the plaintiff. To compute the amount of that verdict you shall determine the amount of the plaintiff's damage in accordance with Instruction No. ____. You must then decide what percent of the total negligence was attributable to the plaintiff and reduce the amount of (his, her, its) total damages by that same percent, returning a verdict for the balance only.
 The words "slight" and "gross" as used here are comparative words. The negligence of a party is not to be evaluated as slight or gross standing alone but only when compared with that of the other party.
 
 
 [10]
 The court's discussion that compactors had been seen in the excavations at night is irrelevant in view of the clear testimony and finding that compactors had never been used until the abutments were in place, a step much later in the process than the one concerned here